1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  GUY T. STRINGHAM,                    No.  2:09-cv-0286 MCE DAD P

12              Plaintiff,

13         v.                            FINDINGS AND RECOMMENDATIONS

14  J. BICK, et al.,

15              Defendants.

16

17         Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under

18  42 U.S.C. § 1983.  This matter is now before the court on the parties' cross-motions for summary

19  judgment.

20                              **BACKGROUND**

21         Plaintiff is proceeding on his second amended complaint against defendants California

22  Department of Corrections and Rehabilitation ("CDCR"), California Medical Facility ("CMF"),

23  Bick, Andreasen, Khoury, Donahue, Thomas and Moreno.  Therein, plaintiff alleges that the

24  defendants violated his rights under the Eighth Amendment and the Americans with Disabilities

25  Act ("ADA") in connection with his transfer him from cell housing with tinted windows,

26  immediate access to a toilet and handholds to dormitory housing without tinted windows,

27  immediate access to a toilet, or handholds.  (Sec. Am. Compl. at 3-20, Pl.'s Decl. & Exs.)

28  /////

                                        1

1        **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

2              Summary judgment is appropriate when the moving party "shows that there is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

4    Civ. P. 56(a).

5              Under summary judgment practice, the moving party "initially bears the burden of

6    proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

7    627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

8    The moving party may accomplish this by "citing to particular parts of materials in the record,

9    including depositions, documents, electronically store information, affidavits or declarations,

10   stipulations (including those made for purposes of the motion only), admission, interrogatory

11   answers, or other materials" or by showing that such materials "do not establish the absence or

12   presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

13   support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden

14   of proof at trial, "the moving party need only prove that there is an absence of evidence to support

15   the nonmoving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.).

16   See also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after

17   adequate time for discovery and upon motion, against a party who fails to make a showing

18   sufficient to establish the existence of an element essential to that party's case, and on which that

19   party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure

20   of proof concerning an essential element of the nonmoving party's case necessarily renders all

21   other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so

22   long as whatever is before the district court demonstrates that the standard for entry of summary

23   judgment, . . ., is satisfied."  Id. at 323.

24             If the moving party meets its initial responsibility, the burden then shifts to the opposing

25   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

26   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

27   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

28   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

                                                    2

1    admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

2    Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

3    fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

4    governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

5    Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

6    genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

7    party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

8            In the endeavor to establish the existence of a factual dispute, the opposing party need not

9    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

10   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

11   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

12   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

13   Matsushita, 475 U.S. at 587 (citations omitted).

14           "In evaluating the evidence to determine whether there is a genuine issue of fact," the

15   court draws "all reasonable inferences supported by the evidence in favor of the non-moving

16   party."  Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is

17   the opposing party's obligation to produce a factual predicate from which the inference may be

18   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

19   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

20   party "must do more than simply show that there is some metaphysical doubt as to the material

21   facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

22   nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

23   omitted).

24                              **OTHER APPLICABLE LEGAL STANDARDS**

25   I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

26           The Civil Rights Act under which this action was filed provides as follows:

27                   Every person who, under color of [state law] . . . subjects, or causes
                     to be subjected, any citizen of the United States . . . to the
28                   deprivation of any rights, privileges, or immunities secured by the

                                                    3

1  Constitution . . . shall be liable to the party injured in an action at
2  law, suit in equity, or other proper proceeding for redress.

3  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

4  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

5  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

6  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

7  meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or

8  omits to perform an act which he is legally required to do that causes the deprivation of which

9  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

10  Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

11  their employees under a theory of respondeat superior and, therefore, when a named defendant

12  holds a supervisorial position, the causal link between him and the claimed constitutional

13  violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979);

14  Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations

15  concerning the involvement of official personnel in civil rights violations are not sufficient.  See

16  Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

17  II.  The Eighth Amendment and Inadequate Medical Care

18  The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment

19  prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v.

20  Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  In order to

21  prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that

22  objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

23  acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

24  Seiter, 501 U.S. 294, 298-99 (1991).

25  Where a prisoner's Eighth Amendment claims arise in the context of medical care, the

26  prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate

27  indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth Amendment medical

28  claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the

4

1   defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991),

2   overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en

3   banc).

4          A medical need is serious "if the failure to treat the prisoner's condition could result in

5   further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974

6   F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include

7   "the presence of a medical condition that significantly affects an individual's daily activities." Id.

8   at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the

9   objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S.

10  825, 834 (1994).

11         If a prisoner establishes the existence of a serious medical need, he must then show that

12  prison officials responded to the serious medical need with deliberate indifference. See Farmer,

13  511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny,

14  delay, or intentionally interfere with medical treatment, or may be shown by the way in which

15  prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th

16  Cir. 1988). Before it can be said that a prisoner's civil rights have been abridged with regard to

17  medical care, however, "the indifference to his medical needs must be substantial. Mere

18  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

19  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

20  105-06. See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

21  negligence in diagnosing or treating a medical condition, without more, does not violate a

22  prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate

23  indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

24  ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835 (quoting

25  Whitley, 475 U.S. at 319).

26         Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S.

27  at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a

28  plaintiff must show that the delay was harmful. See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th

1    Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir.

2    1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State

3    Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a] prisoner need not show

4    his harm was substantial; however, such would provide additional support for the inmate's claim

5    that the defendant was deliberately indifferent to his needs."  Jett v. Penner, 439 F.3d 1091, 1096

6    (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

7           Finally, mere differences of opinion between a prisoner and prison medical staff or

8    between medical professionals as to the proper course of treatment for a medical condition do not

9    give rise to a § 1983 claim.  See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012); Toguchi,

10   391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891

11   F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

12   III.  The ADA and Intentional Discrimination

13          Title II of the ADA provides that:

14                  no qualified individual with a disability shall, by reason of such
                    disability, be excluded from participation in or be denied the
15                  benefits of the services, programs, or activities of a public entity, or
                    be subject to discrimination by such entity.
16

17   To establish a violation of the ADA, a plaintiff must show that:   (1) he or she is a qualified

18   individual with a disability; (2) he or she was excluded from participation in or otherwise

19   discriminated against with regard to a public entity's services, programs, or activities; and (3)

20   such exclusion or discrimination was by reason of his or her disability.  See Simmons v. Navajo

21   County, 609 F.3d 1011, 1021 (9th Cir. 2010); Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir.

22   2002).

23   IV.  Qualified Immunity

24          Government officials enjoy qualified immunity from civil damages unless their conduct

25   violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910

26   (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is

27   presented with a qualified immunity defense, the central questions for the court are:  (1) whether

28   the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

1    defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

2    was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001).

3          The United States Supreme Court has held that "while the sequence set forth there is often

4    appropriate, it should no longer be regarded as mandatory."  Pearson v. Callahan, 555 U.S. 223,

5    236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a

6    statutory or constitutional violation, "there is no necessity for further inquiries concerning

7    qualified immunity."  Saucier, 533 U.S. at 201.  Likewise, if a court determines that the right at

8    issue was not clearly established at the time of the defendant's alleged misconduct, the court may

9    end further inquiries concerning qualified immunity at that point without determining whether the

10   allegations in fact make out a statutory or constitutional violation.  Pearson, 555 U.S. at 236-242.

11         "A government official's conduct violate[s] clearly established law when, at the time of

12   the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

13   official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd,

14   ___U.S.___, ___131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635

15   (1987)).  In this regard, "existing precedent must have placed the statutory or constitutional

16   question beyond debate."  Id.  See also Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002)

17   ("The proper inquiry focuses on  . . . whether the state of the law [at the relevant time] gave 'fair

18   warning' to the officials that their conduct was unconstitutional.") (quoting Saucier, 533 U.S. at

19   202).  The inquiry must be undertaken in light of the specific context of the particular case.

20   Saucier, 533 U.S. at 201.  Because qualified immunity is an affirmative defense, the burden of

21   proof initially lies with the official asserting the defense.  See Harlow, 457 U.S. at 812.

22              **PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS AND EVIDENCE**

23         The evidence submitted by plaintiff in support of his motion for summary judgment

24   appears to establish the following.

25         1.  Plaintiff had a medical chrono dated April 1, 2003, that allowed him to wear dark

26   glasses and use window tint from April 1, 2003, through March 31, 2004.  (Pl.'s SUDF Attach.

27   F.)

28   /////

7

1      2.  On December 17, 2004, plaintiff was moved from cell housing to dormitory housing at

2  CMF.  (Defs.' Ans.)

3      3.  Defendants admit that plaintiff initiated administrative grievances and requests for

4  accommodation under the ADA with respect to his housing assignments.  (Defs.' Ans.)

5      4.  Defendants Bick, Andreasen, and Khoury are not plaintiff's treating physicians.

6  (Defs.' Ans.)

7      5.  Plaintiff has been given non-prescription dark glasses.  The dark glasses fit over

8  plaintiff's prescription glasses.  (Defs.' Ans.)

9      6.  On December 16, 2004, plaintiff was prescribed Imitrx (Zolmitriptan).  (Defs.' Ans.)

10      7.  Plaintiff has Charcot foot and a history of chronic right foot pain.  Plaintiff never

11  suffered a fall while housed in a dormitory.  (Defs.' Ans.)

12      8.  Medical chronos can be used to document a doctor's recommendations.  Medical

13  chronos must be approved by the Chief Medical Officer.  (Defs.' Ans.)

14      9.  Plaintiff was moved to a dormitory because his custody level was Medium A.

15  Dormitories do not have tinted windows at CMF.  (Defs.' Ans.)

16      10.  Plaintiff has written letters and made complaints outside of the Inmate Appeals

17  System involving his medical conditions.  Plaintiff has been issued a cane, leg brace and

18  wheelchair to assist him with his conditions that affect his mobility.  (Defs.' Ans.)

19      11.  On March 20, 2007, plaintiff was moved back to cell housing after this court issued a

20  preliminary injunction in <u>Stringham v. Bick</u>, No. 2:05-cv-0644 FCD GGH P.  (Defs.' Ans.)

21      **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND EVIDENCE**

22      Defendants contend that the evidence they have submitted in support of their motion for

23  summary judgment establish the following 231 undisputed facts.[1]

24  /////

25  /////

26  _____

27  [1]  Defendants' purported undisputed facts are obviously voluminous.  As will be discussed to
   some extent below, the undersigned also finds that in many instances those purported undisputed
   facts themselves establish the existence of disputed issues of material fact and in other instances

28  are not facts at all but are merely argument.

8

**A. Photophobia Caused by Diabetic Retinopathy Aggravated by Multiple Panretinal Photocoagulation Surgery for Proliferative Diabetic Retinopathy**

1.  Plaintiff, Guy Stringham (D-59403), is a California prisoner who is serving a life term of imprisonment and has no current expected release date.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 12:9-14; 13:16-17.)

2.  Plaintiff was diagnosed with Type I diabetes mellitus in 1971 when he was twelve years old.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 33:13-17; Defs.' Ex. B, Pl.'s Dep., September 12, 2012, RT 6:18-25.)  He was treated with insulin and monitoring of his blood sugar levels.  (Defs.' Ex. B, Pl.'s Dep., September 12, 2012, RT 7:1-4.)

3.  Plaintiff lived in Southern California until he was about sixteen years old, when he moved with his parents to Crescent City, California.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 7:22-8:7.)

4.  When he was in high school in Crescent City, California in the mid-1970's, plaintiff was diagnosed with diabetic retinopathy.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 7:10-17.)

5.  Diabetic retinopathy is caused by damage to blood vessels of the retina, which is the layer of tissue at the back of the inner eye.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 7.)  The retina changes light and images that enter the eye into nerve signals that are sent to the brain. There are two stages of diabetic retinopathy - nonproliferative and proliferative.  (Id.)  Most often diabetic retinopathy has no symptoms until damage to the eyes is severe.  (Id.)  Symptoms include blurred vision, slow vision loss over time, floaters, shadows or missing areas of vision, and trouble seeing at night or in low-light conditions.  Diabetic retinopathy can lead to blindness, but it does not cause photophobia.  (Id. ¶ 8.)  Photophobia is an abnormal sensitivity to light that causes discomfort or pain in extreme cases.  It is a symptom of an underlying medical problem. (Id. ¶ 10.)

6.  In 1975 or 1976, about the same time Plaintiff was diagnosed with diabetic retinopathy, he noticed that he was sensitive to light because he "squinted" when the sun came out, and had mild discomfort.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 19:12-13; 38:4-

9

1    6; Defs. Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 7:10-17, 8:4-22.)

2        7.  Plaintiff was prescribed solid gray-tinted eyeglasses for near-sightedness and light

3    sensitivity.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 8:23-9:21.)  Plaintiff was

4    not told by a doctor that his reported light sensitivity was caused by diabetes.  (Defs.' Ex. B,

5    Pl.'s Dep. of Sept. 12, 2012, RT 21:1-8.)

6        8.  Plaintiff worked in a mill making plywood veneer, as an auto mechanic, and a

7    logger, felling and cutting trees from the 1970's until he was arrested in 1986.  (Defs.' Ex. A,

8    Pl.'s Dep., June 12, 2007, RT 12:11-12; RT 19:15-24; Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2007,

9    RT 10:1-11:8.)  He wore his prescription dark glasses on the job, and that was enough for his

10    light sensitivity.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2007, RT 10:1-11:8.)

11        9.  Plaintiff arrived at a reception center at the California Men's Colony-East (CMC-East)

12    on June 19, 1987.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 12:11-19; Defs.' Ex. C, Hinman-

13    Seabrooks Decl., ¶8.)

14        10.  Upon arrival at the reception center, he reported that he had impaired vision and wore

15    eyeglasses.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶8.)  Plaintiff also had occasional left knee

16    pain associated with an old surgically-repaired fracture when he was fourteen years old.  (Defs.'

17    Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 28:19-17.)  Plaintiff was allowed to have his prescription

18    dark glasses and was not required to have a medical chrono at that time.  (Id. RT 12:20- 20.)  He

19    was housed in a double-cell. (Id. RT 13:9-10.)

20        11.  Two months later, on September 23, 1987, plaintiff complained to a medical

21    technical assistant (MTA) that that he had photophobia.  (Defs.' Ex. C, Hinman-Seabrooks Decl.,

22    ¶ 9; Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 14:10-25.)  He was referred to Dr.

23    Johnson, an ophthalmologist.  (Defs.' Ex. B, Hinman-Seabrooks Decl., ¶ 11.)

24        12.  In December 1997, Dr. Johnson saw plaintiff, who complained of glare in both eyes

25    in bright sun.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 12.)  Dr. Johnson's impression was that

26    plaintiff had diabetic retinopathy and should return for a dilated fundoscopic examination of both

27    eyes.  (Id.)  Following that examination, Dr. Johnson found that plaintiff has scattered blot/dot

28    hemorrhages without exudates or neovascularization.  (Id.)  Dr. Johnson's opinion was that

1  plaintiff had non-proliferative diabetic retinopathy.  (Id.)  Dr. Johnson did not find any ocular

2  pathology to explain plaintiff's report of glare in bright sunlight, but he nevertheless ordered

3  sunglasses and a follow-up dilation in six months.  (Id.; Pl.'s Dep. of Sept. 12, 2012, RT 16:17-

4  23.)  Plaintiff would get replacement glasses when his prescription changed, or the glasses wore

5  out or broke.  (Pl.'s Dep. of Sept. 12, 2012, RT 18:6-14.)

6       13.  On January 6, 1988, plaintiff told an optometrist to whom Dr. Johnson had referred

7  him that he had a history of photophobia and wanted eyeglasses with photo-sensitive lenses.

8  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 13.)  The optometrist noted that plaintiff's current

9  prescription was for corrected vision of 25/25 in his right eye and 25/25 plus in his left eye.  (Id.)

10  Following refraction, the optometrist changed his eyeglasses prescription to provide 25/25 plus

11  vision in both eyes.  (Id.)  The optometrist did not note that plaintiff had any ocular pathology

12  to support his complaint of photophobia, but nevertheless ordered Concorde-style frames with

13  "photo-gray extra" lenses.  (Id.; Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 16:13-

14  18:5.)  Photo-sensitive lenses are clear (or nearly clear) indoors and darken automatically in

15  response to sunlight.  (Defs.' Ex. C, Hinman-Seabrooks Dec., ¶ 13.)  Photo-gray extra means the

16  lenses provide more darkening than standard photo-gray lenses.  (Id.)  Concorde-style frames

17  wrap around the face and block more light coming from the side than regular frames.  (Id.)

18  Plaintiff received the new prescription glasses in March 1988, but those lenses had to be reground

19  because of an error.  (Id.)  Plaintiff received his new eyeglasses in June 1988.  (Id.)  He also has a

20  pair of clear prescription reading glasses.  (Pl.'s Dep. of Sept. 12, 2012, RT 19:19-23.)  Plaintiff

21  reads using a 25-watt high intensity lamp for a hour a day, or more when he doing legal work.

22  (Id. RT 20:6-16.)

23       14.  Dr. Johnson saw plaintiff on August 19, 1988, and ordered a fluorescein

24  angiogram.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 16.)  That is an eye test which uses special

25  dye and a camera to look at blood flow in the retina and choroid (the two layers in the back of the

26  eye).  (Id.)  The test is done to determine if there is proper blood flow in those areas of the eye.

27  (Id.)

28  /////

11

15. On October 28, 1988, Dr. Johnson saw plaintiff for follow-up on the fluorescein angiogram results and noted that he reported blurred vision when reading. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 17.) Dr. Johnson's impression was that plaintiff had proliferative diabetic retinopathy in the right eye and macular edema (swelling of the macula) in both eyes. (Id.) The macula is an area five millimeters in diameter in the retina where light is focused and vision is clearest. (Id.) Dr. Johnson found that plaintiff had proliferative diabetic retinopathy in his right eye and ordered a laser surgical procedure called panretinal photocoagulation. (Id.)

16. Proliferative diabetic retinopathy is a more severe and advanced form of diabetic retinopathy. In proliferative diabetic retinopathy, new blood vessels start to grow in the eye because of restricted circulation caused by diabetes, but the new vessels are fragile and can bleed. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 18.) Small scars can also develop on the retina and other parts of the eye. (Id.) When this advanced stage of retinopathy occurs, a form of laser surgery called panretinal photocoagulation is usually recommended. (Id.) A special laser is used to make tiny burns that seal the retina and stop vessels from growing and leaking in order to reduce the risk of vitreous hemorrhage and retinal detachment. (Id.) The goal of panretinal photocoagulation is to prevent the development of new vessels over the retina and elsewhere that could lead to blindness. (Id.) The procedure does not restore lost vision. (Id.) Typically, the procedure is done on one eye, and then later on the other eye. (Id.) After the laser treatment, vision initially may decrease because of edema/swelling of the retina, but then may improve to its previous level in two to three weeks, or it can remain permanently deteriorated. (Id.) Recurrences of proliferative retinopathy may occur even after an initial satisfactory response to treatment. (Id.) Panretinal photocoagulation reduces peripheral vision in order to save as much of the central vision as possible, and to save the eye itself. (Id.)

17. On November 8, 1988, plaintiff had panretinal photocoagulation on his right eye, and two weeks later on his left eye. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 19.)

18. Plaintiff claims that his sensitivity to light was "immediately exacerbated" after the laser surgeries. (Pl.'s Dep., September 12, 2012, RT 21:9-18.)

/////

19.  Light sensitivity can be a short-term effect of panretinal photocoagulation surgery, but it is not a long-term effect.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 20.)  Plaintiff does not have ocular pathology showing that the panretinal photocoagulation aggravated a pre-existing photophobia, and plaintiff does not remember telling the ophthalmologist that he had increased sensitivity to light following the surgeries.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 20; Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 23:4-10.)  Plaintiff is not a doctor and does not know whether his light sensitivity was caused by the laser surgeries, or was just because his eye condition got worse as he grew older.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 24:20-25:19.)

20.  Plaintiff's claim that he had increased sensitivity to "peripheral" light after the panretinal photocoagulation does not have a basis in fact because a patient receiving the type and amount of laser surgery he had would have dimmed vision and reduced sensitivity to light in the peripheral areas of the retina.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 21.)

21.  Plaintiff testified that sometime in 1988 or 1989, at the time of the laser surgeries," he went "snow blind" (everything went white) once, when he was walking on the prison yard on a sunny day next to a brightly painted wall.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 22.)  Because panretinal photocoagulation affects the function of the retinal periphery, some patients will recognize decreased peripheral and night vision.  (Id.)  After panretinal photocoagulation, blurred vision is very common.  (Id.)  Usually, this blur goes away, but in a small number of patients some blur will continue forever.  (Id.)  What  plaintiff claims to have experienced is not evidence of long-term increased photophobia aggravated by the surgeries.

22.  On January 6, 1989, plaintiff was seen for follow-up on the November 1988 panretinal photocoagulation procedures.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 23.)  Dr. Johnson noted that plaintiff continued to have neovascularization and would be seen for further follow-up in six weeks when different laser treatment on his left eye would be considered if there was continued neovascularization.  (Id.)

23.  On February 17, 1989, Dr. Johnson noted that the neovascularization of the right eye was resolving, and that further surgery was not indicated at that time.  (Defs.' Ex. C, Hinman-

13

1  Seabrooks Decl., ¶ 24.)

2         24.  On June 2, 1989, Dr. Johnson saw plaintiff and found that because the

3  neovascularization on his right eye was larger than before, further surgery was indicated.  (Defs.'

4  Ex. C, Hinman-Seabrooks Decl., ¶ 25.)  Repeat panretinal photocoagulation was done on June 20,

5  1989, on plaintiff's right eye, and nine days later on the left eye. (Id.)

6         25.  On September 15, 1989, Dr. Johnson saw plaintiff who reported that he saw "smoke"

7  on the right side of his right eye.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 26.)  Dr. Johnson

8  found that plaintiff's condition was stable and ordered a follow-up dilation examination in six

9  months. (Id.)

10         26.  On November 17, 1989, Dr. Johnson found that plaintiff's proliferative diabetic

11  retinopathy remained stable.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 27.)

12         27.  On December 28, 1989, plaintiff arrived at CMF and was housed in a double-cell.

13  (Defs.' Ex. E, Weaver Decl., ¶ 6.)

14         28.  On February 26, 1990, consulting ophthalmologist Dr. Louis saw plaintiff and noted

15  that the neovascularization on the left eye had resolved, but there was active neovascularization

16  on the right eye.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 28.)  Dr. Louis ordered further

17  panretinal photocoagulation on the peripheral areas of plaintiff's right eye, which was done in late

18  March 1990. (Id.)

19         29.  On June 27, 1990, consulting optometrist Dr. Steffen saw plaintiff, who

20  complained that his eyes tired easily from "near work photophobia."  (Defs.' Ex. C, Hinman-

21  Seabrooks Decl., ¶ 29.)  Plaintiff testified that he had gotten a clerk's job in March 1990

22  and was reading and typing a lot, so his eyes became tired.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12,

23  2012, RT 26:10-27:4.) Tired eyes from reading does not cause photophobia, and the optometrist

24  did not note any ocular pathology to support that complaint.  (Defs.' Ex. C, Hinman-Seabrooks

25  Decl., ¶ 29.) Dr. Steffen refracted plaintiff and ordered new eyeglasses with photo-gray extra

26  lenses with a Hudson # 13 frame in silver tone.  (Id.)  Those glasses were received by plaintiff in

27  July 1990.  (Id.)  The photo-gray lenses were as dark as medical staff could get, and became

28  darker when plaintiff went outside to exercise on the yard.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12,

1 | 2012, RT 27:9-28:4.)

2 |   30.  On October 22, 1990, Dr. Louis saw plaintiff for follow-up and noted that his

3 | proliferative diabetic retinopathy was in good control.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶

4 | 30.)

5 |   31.  Plaintiff's proliferative diabetic retinopathy in both eyes remained stable until June

6 | 27, 1995, when consulting ophthalmologist Dr. Roth, found that plaintiff had retinal hemorrhages

7 | in his right eye and advised that laser surgery should be performed on that eye, which was done

8 | the following month. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 32.)

9 |   32.  On November 7, 1995, Dr. Roth saw plaintiff who complained that a line appeared on

10 | the left side of his right eye if he shook his head.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 33.)

11 | Plaintiff's corrected vision was 20/25 in each eye.  (Id.)  Dr. Roth found that plaintiff's left eye

12 | was negative for hemorrhages, but performed further surgery for hemorrhages on the right eye.

13 | (Id.)  Dr. Roth saw plaintiff for follow-up three weeks later and noted extensive 360-degree

14 | panretinal photocoagulation had been done in both eyes.  (Id.)

15 |   33.  On July 2, 1996, Dr. Roth saw plaintiff for follow-up and found hemorrhages in the

16 | left eye for which further laser surgery was performed the following week.  (Defs.' Ex. C,

17 | Hinman-Seabrooks Decl., ¶ 34.)  Dr. Roth noted that plaintiff claimed that his insulin treatment

18 | gave him spots in the center of vision.  (Id.)  Dr. Roth also noted that plaintiff reported that he

19 | was "photophobic!"  (Id.)  The exclamation point indicated that Dr. Roth was surprised by that

20 | report because, for the reasons discussed above, he had no ocular pathology to explain

21 | photophobia, and patients who had received the amount and kind of laser treatment plaintiff had,

22 | had dimmed vision and light sensitivity, not increased light sensitivity.  (Id.)  Dr. Roth planned to

23 | do more laser surgery on plaintiff's left eye and then send him to an optometrist to refract him for

24 | a new eyeglass prescription.  (Id.)  Plaintiff went to an optometrist who refracted him for new

25 | eyeglasses in September 1996. (Id.)  The surgery was done a week later, and a new eyeglass

26 | prescription was written in late September 1996. (Id.)

27 |   34.  On December 3, 1996, Dr. Roth saw plaintiff who complained of "floaters" and pain

28 | in his right eye for two weeks.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 35.)  Dr. Roth

1   found that further laser surgery for hemorrhages in both eyes was indicated, and it was done that
2   day.  (Id.)

3       35.  On February 25, 1997, Dr. Roth found that plaintiff had an early cataract and
4   neovascularization in both eyes and did further laser surgery.  (Defs.' Ex. C, Hinman-Seabrooks
5   Decl., ¶ 36.)

6       36.  On March 11, 1997, plaintiff was seen for follow-up and again reported that he saw
7   "floaters.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 37.)  Dr. Roth found hemorrhages and
8   neovascularization in both eyes and ordered further laser surgery, which was done on the left eye
9   on March 31, 1997, with approximately 100 applications in each eye.  (Id.)  While waiting for
10  that surgery, plaintiff wrote letters asking to be transferred to Pelican Bay State Prison to be
11  closer to where his family resided.  (Id.)  In those letters, plaintiff claimed that he was
12  photophobic in both eyes and needed "photogray type lenses in [his] glasses."  (Id.)  There is no
13  mention in the letters, or plaintiff's medical records to that date, of a need to be housed in a cell
14  with tinted windows because of photophobia.  (Id.)

15      37.  On August 19, 1997, Dr. Crapotta, an ophthalmologist, saw plaintiff for follow-up
16  and noted that plaintiff said that his eyes were "weird!" and that he might need new eyeglasses,
17  which he had not received for five years.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 38.)  That
18  was not true; as discussed above, since plaintiff had been refracted for and had received new
19  glasses in September of 1996.  (Id.)  Dr. Crapotta found that plaintiff was negative for retinal
20  hemorrhages and exudates (opacities in the retina from the escape of blood from defective blood
21  vessels).  (Id.)

22      38.  On October 1, 1997, an optometrist refracted plaintiff, found that the eyeglasses he
23  had were adequate, but wrote a prescription for new eyeglasses to provide plaintiff  with 20/20
24  vision in both eyes.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 39.)

25      39.  On March 3, 1998, Dr. Crapotta saw plaintiff and found that he had no hemorrhages
26  or exudates and ordered follow-up in six months, or as needed, for vision symptoms.  (Defs.' Ex.
27  C, Hinman-Seabrooks Decl., ¶ 40.)

28  /////

40.  On May 12, 1998, an optometrist refracted plaintiff for new eyeglasses.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 41.)  The optometrist noted that plaintiff complained that he was photophobic.  (Id.)  Although the optometrist noted no ocular pathology for that complaint, he ordered dark tint on plaintiff's eyeglasses "due to advanced diabetic retinopathy."  (Id.)  Diabetic retinopathy does not cause photophobia.  (Id.)

41.  On September 1, 1998, Dr. Crapotta saw plaintiff for follow-up and found that Plaintiff's proliferative diabetic retinopathy was stable.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 42.)  No treatment was ordered at that time.  (Id.)

42.  Plaintiff's eyes have been stable, and have not required further surgical procedures since 1998, except for vision getting slowly worse over time with age.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 30:14-31:3.)

43.  On March 4, 1999, Dr. Crapotta saw plaintiff for follow-up.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 43.)  Plaintiff had 20/25 corrected vision in both eyes with eyeglasses.  (Id.)  Dr. Crapotta did not find that he had any indications for further treatment at that time and ordered a follow-up in six months.  (Id.)  He did not find that plaintiff needed a medical chrono for cell housing with window tint because of photophobia.  (Id.)

44.  On April 22, 1999, plaintiff was moved from a cell to a lower bunk (P-142L) in a Wing P-1 dorm.  (Defs.' Ex. E, Weaver Decl., ¶ 10.)

45.  On May 28, 1999, Dr. Gordon, who was not an ophthalmologist or optometrist, saw plaintiff in the B-1 Clinic in response to his request for allergy medication and a medical chrono for a single cell.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 45.)  Plaintiff asked for a medical chrono for an upper bunk for "claustrophobia" and cell housing with tinted windows due to his complaint of suffering from photophobia, which Dr. Gordon questioned was secondary to diabetic retinopathy.  (Id.)  Plaintiff told Dr. Gordon that he needed cell housing because he could not tint windows in a dorm.  (Id.)  There is no ocular pathology that would support plaintiff's claim that he had photophobia for which he needed cell housing with tinted windows, in addition to the dark glasses that he had been given.  (Id.)  Nevertheless, Dr. Gordon handwrote a medical chrono for the housing that plaintiff had requested without any documentation of the medical

basis for such a housing assignment.  (Id.)  There is also no typewritten medical chrono showing that the Chief Medical Officer approved Dr. Gordon's recommendation.  (Id.)  This is the first time in the twelve preceding years of plaintiff's incarceration that a doctor had given plaintiff a medical chrono for cell housing with window tint in connection with his claim of photophobia. (Id.)  There also had been no change in plaintiff's vision to support Dr. Gordon's finding and issuance of the medical chrono. (Id.)

46.  On July 9, 1999, an optometrist refracted plaintiff for new prescription eyeglasses to provide him with 20/20 corrected vision.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 46.)  The optometrist referred plaintiff to the ophthalmologist for a medical chrono for sunglasses to be worn outdoors.  (Id.)  Dr. Crapotta saw plaintiff in the B-1 Clinic on July 27, 1999, and wrote a medical chrono for tinted glasses for diabetic retinopathy, finding that a repeat visit with the ophthalmologist was not needed.  (Id.)

47.  On September 7, 1999, Dr. Crapotta saw plaintiff for follow-up, noted that he had an early cataract, a floater in his right eye, and proliferative diabetic retinopathy that was stable. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 47.)  Dr. Crapotta ordered a follow-up in six months. (Id.)  He did not recommend a medical chrono for cell housing with tinted windows for photophobia at that time. (Id.)

48.  On September 22, 1999, Dr. Geraghty saw plaintiff for follow-up on his diabetes and noted that  plaintiff claims that he was stressed by problems with "group living."  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 48.)  Plaintiff agreed to try available stress-reduction techniques. (Id.)

49.  On November 5, 1999, Dr. Geraghty saw plaintiff in the B-1 Clinic for follow-up with respect to his diabetes.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 49.) Dr. Geraghty noted that eyeglasses were being ordered for plaintiff's reported photosensitivity.  (Id.)

50.  On December 17, 1999, Dr. Geraghty saw plaintiff for diabetes follow-up and noted that new eyeglasses had been ordered for plaintiff.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 50.)

/////

51. On February 23, 2000, Dr. Burr saw plaintiff for a diabetes chronic care follow-up. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 51.)  Dr. Burr was not an ophthalmologist or optometrist, and this appears to have been the first time he saw plaintiff, who complained of photophobia and reported that dark glasses had been ordered for him four months earlier.  (Id.)  Dr. Burr's impression was that plaintiff was light sensitive, which gave him headaches.  (Id.)  Dr. Burr noted that his medical chrono was secondary to laser surgery, but, as discussed previously, the surgeries would not have caused the reported light sensitivity.  (Id.)  Plaintiff had no ocular pathology to support his claim of photophobia, and no history of headaches caused by photophobia.  There had been no documented change in his vision status.  Plaintiff was housed in a dorm (Bed. No. P-142L) at the time.  (Defs.' Ex. E, Weaver Decl., ¶¶ 10-11.)  If plaintiff was having headaches related to his vision at that time, it is likely that they were caused by strained vision due to the delay in delivery of new prescription dark glasses, and not because of photophobia from changes in his vision or ocular pathology.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 51.)  Dr. Burr noted that plaintiff had a medical chrono for new dark eye glasses, which had been on order for four months, and continued him on his treatment regimen without change.  (Id.)

52. Two days later, on February 25, 2000, Dr. Geraghty saw plaintiff, who complained of a problem with the eyeglasses that had been ordered.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 52.)  Plaintiff told Dr. Geraghty that he felt he needed cell housing because of his frequent need to use a toilet for polyuria and occasional diarrhea.  (Id.)

53. On March 7, 2000, Dr. Crapotta saw plaintiff for follow-up, noted that his condition was stable, and renewed a medical chrono for dark glasses for photophobia.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 53.)  The same day, eyeglasses with photo-gray extra lens that had been ordered on February 29, 2000, were shipped to CMF.  (Id.)  Dr. Crapotta recommended, and Dr. Andreasen approved, a medical chrono for plaintiff to have those glasses because of "abnormal light-dark adaptation" secondary to retinal laser treatment in the past for diabetic retinopathy.  (Id.)  Dr. Crapotta did not document what "light-to-dark adaptation problems" plaintiff had that would warrant dark glasses.  (Id.)  Plaintiff did not have any ocular pathology to

1    explain his need for dark glasses, except for an early cataract.  (Id.)  A light-adaptation problem

2    means difficulty adjusting when moving between areas with different lighting levels, e.g., from

3    sunlight to a dim room, or vice versa.  (Id.)  A person with light-to-dark adaptation problems is

4    managed with photo-sensitive lenses, which plaintiff had, because they allow in different levels of

5    light in different light conditions.  (Id.)  Plaintiff would have had reduced, not increased,

6    sensitivity to light associated with the prior panretinal photocoagulation procedures.  (Id.)

7        54.  On May 18, 2000, Dr. Geraghty saw plaintiff, who reported that he had gotten

8    sunglasses, but that he wanted prescription lenses with a dark tint.  (Defs.' Ex. C, Hinman-

9    Seabrooks Decl., ¶ 54.)  Plaintiff also claimed he needed cell housing because of gastrointestinal

10   enteropathy and urgency, not for light sensitivity.  (Id.)  He also claimed to be unable to have a

11   work assignment for a number of problems, including light sensitivity.  (Id.)  Dr. Geraghty

12   recommended a medical chrono finding that plaintiff be classified as totally medically disabled

13   for one year because he was no longer to have even a light-duty work assignment because of

14   various medical problems, including "problems with ambient light."  (Id.)  Dr. Andreasen

15   approved Dr. Gerathty's recommendation.  (Id.)  There is no medical basis for the finding that

16   plaintiff could not hold even a light-duty assignment because of problems with ambient light

17   when using his dark prescription lenses, and that medical chrono did not provide for cell housing

18   with window tinting. (Id.)

19       55.  On May 26, 2000, new prescription eyeglasses, with clear lenses with gray #3 tint,

20   were made for plaintiff to replace the previous ones he said were not what he wanted.  (Defs.'

21   Ex. C, Hinman-Seabrooks Decl., ¶ 55.)

22       56.  On August 18, 2000, plaintiff was moved to Bed No. I-133U in a cell in Wing I-1 but

23   was moved back to Bed No. P-142L, in the Wing P-1 dorm four days later.  (Defs.'Ex. E, Weaver

24   Decl., ¶ 11.)

25       57.  On August 22, 2000, Dr. Geraghty saw plaintiff for diabetes follow-up.  (Defs.' Ex.

26   C, Hinman-Seabrooks Decl., ¶ 57.)  Plaintiff told Dr. Geraghty that his move to a cell had helped

27   "greatly" because his "sun exposure" was less.  (Id.)  Plaintiff reported that his "retinopathy was

28   comfortable" with use of the new eyeglasses.  (Id.)  Dr. Geraghty recommended, and Dr.

1   Andreasen approved, a medical chrono that day for lower bunk/lower tier housing secondary to

2   joint disease, but he did not recommend cell housing with tinted windows for light sensitivity.

3   (Id.)  The same day, plaintiff was moved back to the lower-bunk bed (P-142L) in the P-Wing

4   dorm.  (Id.)

5        58.  On September 1, 2000, Dr. Geraghty recommended, and Acting Chief Medical

6   Officer Doust approved, a medical chrono for plaintiff's housing in a cell with tinted windows

7   "secondary to advanced diabetic retinopathy.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 58.)

8   There is no progress note to support that medical chrono, and plaintiff's diabetic retinopathy

9   did not cause photophobia or any other vision problem that required housing in a cell with tinted

10  windows, in addition to the dark prescription eyeglasses and sunglasses that he had received.

11  (Id.)  That chrono was not typed until September 11, 2000. (Id.)  In the meantime, Dr. Crapotta

12  saw plaintiff on September 5, 2000, and found no change in his vision due to diabetic retinopathy.

13  (Id.)  Plaintiff saw Dr. Geraghty the same day and told him he was back in a dorm and wanted Dr.

14  Gordon's May 28, 1999 chrono renewed.  (Id.)  It appears Dr. Geraghty's cell housing chrono

15  was intended to be a "continuance" of Dr. Gordon's earlier chrono, but there was no medical

16  basis for that earlier chrono for cell housing with tinted windows for photophobia, in addition to

17  sunglasses and dark prescription eyeglasses.  (Id.)  To the extent that Dr. Geraghty's medical

18  chrono, and subsequent ones for cell housing with tinted windows, relied on, and were renewals

19  of, Dr. Gordon's medical chrono, they were not supported by plaintiff's vision status and ocular

20  pathology.

21       59.  On December 18, 2000, plaintiff was moved to a cell (P-134L) in Wing P-1.  (Defs.'

22  Ex. E, Weaver Decl., ¶ 12.)

23       60.  On April 26, 2001, Dr. Crapotta found that plaintiff's proliferative diabetic

24  retinopathy was unchanged and required no further treatment.  (Defs.' Ex. C, Hinman-Seabrooks

25  Decl., ¶ 60.)  Dr. Crapotta recommended, and Dr. Andreasen approved, a medical chrono stating

26  that plaintiff had received extensive retinal laser treatment with "expected light adaptation

27  problems" for which dark glasses and housing in a cell with window tinting were recommended.

28  (Id.)  This was the first time Dr. Crapotta had recommended cell housing with window tint, rather

than simply dark glasses.  (Id.)  Dr. Crapotta's notes do not show a change in plaintiff's vision status that would justify the recommendation for cell housing with tinted windows, and plaintiff had no ocular pathology to support such a recommendation.  (Id.)  Dr. Crapotta's recommendation, therefore, was apparently based on Dr. Gordon's unsupported and unapproved medical chrono the previous year.

61.  On May 25, 2001, Dr. Altchek saw plaintiff, who complained of "photophobia and headaches," and asked for "something stronger than Motrin."  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 61.)  Dr. Altchek noted that plaintiff had sunglasses, but ordered Ultram, 100 mg., q.i.d. (four times a day), p.r.n. (as needed) for headaches for 45 days.  (Id.)  Plaintiff's "photophobia" complaint was unexplained and not supported by his ocular pathology, and there is no reason he would have headaches from light exposure while wearing dark prescription glasses or sunglasses, as well as being housed in a cell.

62.  On July 2, 2001, Dr. Altchek saw plaintiff who complained of "chronic migraine headaches."  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 62.)  There is no prior history of migraine headaches caused by light sensitivity, and no ocular pathology to show that plaintiff had headaches that were triggered by exposure to light.  (Id.)  Dr. Altchek recommended a medical chrono, approved by Dr. Andreasen that, in part, stated that he had advanced diabetic retinopathy for which he wore sunglasses.  (Id.)  Plaintiff's proliferative diabetic retinopathy and panretinal photocoagulation surgeries would not have made him sensitive to light and triggered migraine headaches.  (Id.)

63.  On July 6, 2001, an optometrist noted that plaintiff refused an appointment because his eyeglass prescription had not changed, but he gave the optometrist one "chipped" lens and asked that it be replaced with a new photo-gray lens.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 63.)  The optometrist noted that dark sunglasses, which were in good condition, had been issued to plaintiff the previous year, and that he was still using them.  (Id.)  The optometrist explained that photo-gray lenses would not be placed on a different frame if he was still using the dark eyeglasses that had been issued, that there was no change in his prescription, and that the frame was not broken.  (Id.)

64.   On September 5, 2001, plaintiff's medical chrono for cell housing with window tinting was renewed.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 64.)  Plaintiff had no vision problem or ocular pathology to support the renewal of the previous chrono, for which there was also no ocular basis for cell housing with window tint.  (Id.)

65.   On November 29, 2001, Dr. Andreasen approved a one-year medical chrono that recommended continued cell housing, but it did not list photophobia as a reason for that housing assignment.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 65.)

66.   On April 23, 2002, Dr. Crapotta saw plaintiff and found that he was doing well with a clear vitreous and no peripheral lesions.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 66.)  Dr. Crapotta again recommended a medical chrono for dark glasses and window tinting for one year for light adaptation problems following extensive peripheral laser treatment that Dr. Bick, the Chief Medical Officer, approved.  (Id.)  There was no vision problem or ocular pathology to explain the finding of "light adaptation problems" that necessitated both dark glasses and cell housing with window tinting.  (Id.)

67.   On August 20, 2002, Dr. Altchek recommended, and Dr. Bick approved, a medical chrono for cell-based housing, in part because plaintiff had advanced diabetic retinopathy that required sunglasses because he could not tolerate light.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 67.)  Diabetic retinopathy does not cause sensitivity to light, and plaintiff had no vision problem or no ocular pathology to explain a need for both dark glasses and cell-based housing with window tint.  (Id.)

68.   On October 1, 2002, Dr. Crapotta saw plaintiff and noted that his proliferative diabetic retinopathy was stable, that plaintiff had no hemorrhages, macular edema, or exudates; that his vitreous was clear, and that the peripheral retinal areas of both eyes were clear.  A six-month follow-up was ordered.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 68.)

69.  Dr. Altchek saw plaintiff for a complaint of severe tooth pain on the left side of his face and complained of a "migraine" headache, chills, hot flashes, and "photosensitivity."  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 69.)  Dr. Altchek noted a probable dental abscess on the left upper jaw.  (Id.)  He ordered migrapap (Midrin), two tablets, b.i.d., p.r.n. for 60 days for the

23

1  headache pain.  (Id.)  A headache secondary to nerve pain caused by a tooth abscess is not a

2  "migraine" headache caused by "photosensitivity," and Midrin is not a medication that is

3  indicated for that kind of pain.

4       70.  Plaintiff was housed in a cell (W-121L) from March 1, 2003, to May 13, 2003, when

5  he was moved to cell (I-137L) in Wing I-1.  (Defs.' Ex. E, Weaver Decl., ¶ 13.)

6       71.  On March 1, 2003, Dr. Altchek noted that plaintiff's medical chrono was

7  accommodated because he was allowed to have his dark glasses, and the cell was in a dark area,

8  and had a grid-type material covering the window.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶

9  71.)  Dark glasses alone would have been sufficient to accommodate any light sensitivity problem

10  caused by an early cataract. (Id.)

11       72.  On April 1, 2003, Dr. Saukhla saw plaintiff concerning repair of his dark glasses,

12  which had been broken.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 72.)  Plaintiff said he

13  wanted to repair the glasses himself in his cell.  (Id.)  Dr. Saukhla noted that plaintiff had a

14  medical chrono for the dark glasses.  (Id.)  Dr. Saukhla noted that he would write the "eye clinic"

15  to have the eyeglasses repaired, and the same day recommended a medical chrono for dark

16  glasses and window tint for diabetic retinopathy and light adaptation problems following

17  extensive peripheral laser treatment in both eyes.  (Id.)  For the reasons discussed previously,

18  plaintiff had no vision or ocular pathology to support the need for cell housing with window

19  tinting, in addition to sunglasses and dark prescription eyeglasses.  (Id.)  For that reason, Dr.

20  Bick's notation approving cell housing with window tint if custody staff agreed was appropriate.

21  There was no medical necessity for this kind of housing from an ocular standpoint.  (Id.)

22       73.  On May 22, 2003, Dr. Crapotta saw plaintiff and noted that his proliferative

23  diabetic retinopathy was "quiescent."  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 73.) A three-

24  month follow-up was ordered.  (Id.)

25       74.  On September 23, 2003, Dr. Crapotta saw plaintiff for follow-up, noted no

26  changed in his proliferative diabetic retinopathy that required treatment, and ordered a follow-up

27  in six months.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 74.)

28  /////

1    75.  On November 3, 2003, nursing staff noted that plaintiff had received three pairs of

2    eye glasses that day.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 75.)

3    76.  On January 30, 2004, plaintiff filed a grievance (Log No. CMF-04-M-192) that, in

4    part, claimed that he had not been given dark glasses, and housed in a cell with tinted windows,

5    which were required for his diabetic retinopathy.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 76;

6    Defs.' Ex. G, Bick Interrog. Resp., Attach. 5.)  The grievance asked that a medical chrono be

7    "renewed" for cell housing because he had three previous chronos for one (April 26, 2001;

8    September 1, 2001; November 29, 2001), all of which had expired.  (Id.)  Plaintiff asked that

9    custody staff be prohibited from moving him to dormitory housing.  (Id.)  Plaintiff claimed that

10   Dr. Bick had refused to approve cell housing in a July 2003 medical chrono recommended by Dr.

11   Shellcroft.  (Id.)  But there was no July 2003 chrono, and the August 3, 2003 medical chrono by

12   Drs. Shellcroft and Bick did not recommend cell housing.  (Id.)  Plaintiff claimed that if he was

13   moved to a dormitory without tinted windows the light from windows would "trigger" migraine

14   headaches.  (Bick Interrog. Resp., Attach. 3.)  Review at the informal and formal levels of review

15   was bypassed.  Plaintiff was in Wing I, Cell No. 137L at the time.  Senior MTA Donahue

16   interviewed plaintiff, reviewed his medical record, and prepared a response to plaintiff's

17   grievance based on Dr. Bick's decision at the second level of review.  (Defs.' Ex. H, Donahue

18   Interrog. Resp. No. 1.)  Dr. Bick, the Chief Medical Officer, approved the denial on March 15,

19   2004 because his visual impairment met criteria for dormitory housing, and the need for window

20   tinting could be accommodated with sunglasses provided by the Wing B-2 Medical Supply

21   Department.  (Id.)  Dr. Bick wanted plaintiff to use clear State-issued prescription lenses and wear

22   tinted goggles over them.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 94:12-17.)  Plaintiff

23   appealed to the second level where the grievance was reviewed by Dr. Andreasen, the Chief

24   Medical Officer for Inpatient Services, on behalf of Warden Schwartz and denied by Dr. Khoury,

25   Chief Deputy for Clinical Services, on April 15, 2004.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶

26   76; Defs.' Ex. G, Bick Interrog. Resp., Attach. 5.)  At that level of review, plaintiff claimed that

27   State-issued sunglasses did not accommodate his need for cell-housing with tinted windows

28   because they allowed light in from the side and did not block peripheral light when worn over his

1   prescription eyeglasses.  (Id.)  Dr. Khoury found that the State-issued goggles did block

2   peripheral light and were large enough to fit over prescription eyeglasses, and that the dorm in

3   Wing G-3 had no outside windows and was darker than the dorms with outside views.  (Id.)

4   Plaintiff testified that he wanted cell housing only.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT

5   30:14-16.)  Plaintiff appealed to the third level of review on June 7, 2004, but the inmate

6   grievance was rejected at the Director's level by Chief of Inmate Appeals Grannis on July 16,

7   2004, because it was not timely.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 76; Defs.' Ex. G,

8   Bick Interrog. Resp., Attach. 5.)

9       77.  On March 9, 2004, Dr. Crapotta recommended that plaintiff have a medical chrono

10   for dark glasses and window tint in his housing "consistent with prison regulations."  (Defs.' Ex.

11   C, Hinman-Seabrooks Decl., ¶ 77.)  Dr. Bick, however, allowed CMF-approved dark glasses

12   only, and not cell housing with window tinting.  (Id.)  Dr. Bick's decision was appropriate, and

13   Dr. Crapotta's recommendation for cell housing with window tinting was not supported by

14   plaintiff's vision problem and ocular pathology.  (Id.)

15       78.  On December 17, 2004, plaintiff was moved from lower bunk (I-137L) in a cell

16   with tinted windows in I Wing to the lower bunk (J-353L) in one of the regular dorms in Wing J-

17   3 Wing.  (Pl.'s Sec. Am. Compl. filed Feb. 24, 2012 (ECF No. 53) at 14, ¶ 5; Defs.' Ex. K,

18   Thomas Interrog. Resp. No. 1.)  At the time, Dr. Bick had approved a March 9, 2004 medical

19   chrono that allowed him to have CMF-approved dark glasses.  (Defs.' Ex. C, Hinman-Seabrooks

20   Decl., Attach. 1, HS 229.)  Dr. Bick had not approved a recommendation by Dr. Crapotta, an

21   ophthalmologist, that plaintiff's housing should also have window tinting, consistent with CMF

22   regulations.  (Id.)  Therefore, plaintiff did not have a medical chrono for cell housing at the time

23   of this housing change.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 23:5-10.)

24       79.  In late December 2004 and into 2005, CMF had to appropriately house an influx of

25   inmates serving life terms with Close custody designations in cells during ongoing remedial

26   actions in Coleman v. Schwarzenegger, et al, No. 2:90-cv-0520 LKK JFM P and provide

27   additional inpatient mental health treatment beds.  (Defs.' Ex. K, Thomas Interrog. Resp. No. 1;

28   Pl.'s Summ. Judg. Mot filed July 12, 2012 (ECF No. 58), Attach. E [Dickinson Decl.], ¶ 16.)  The

1   Court had required the conversion of general population housing units at various prisons to be

2   used for additional beds to house mentally ill inmates.  (Id.)  To comply with that order, CMF had

3   to make room for inmates, including Close B custody inmates, who were transferred from Salinas

4   Valley State Prison in December 2004.  (Id.)  Close custody inmates are those whose case factors

5   indicate a need for close supervision.  (Id.)  State regulations require that Close custody inmates

6   be housed in cells to ensure institutional security and public safety.  (Id.)

7         80.  Because plaintiff was a Medium A custody inmate, who did not have a medical

8   chrono for cell housing, he was among a group of Medium A custody inmates who were moved

9   from cells to dorms to make room for Close custody inmates and Medium A custody inmates

10   designated for single cells.  (Pl.'s Summ. Judg. Mot filed July 12, 2012, Attach. E [Dickinson

11   Decl.], ¶ 16; Defs.' Ex. K, Thomas Interrog. Resp. No. 1.)  The prisoner who moved to the bed

12   that plaintiff had previously occupied in Wing I-1 was a Close custody inmate who needed a

13   lower bunk.  (Defs.' Ex. K, Thomas Interrog. Resp. No. 1.)  The other inmate had come from

14   Wing P-2, which had been shut down. (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 117:21-

15   118:9.)

16         81.  Plaintiff's bed in the dorm was opposite a large exterior window, and the lights were

17   on most of the day, but officers allowed him to drape bedding over his lower bunk to reduce the

18   light, and he also closed his eyes when felt the light was bothering him.  (Defs.' Ex. A, Pl.'s Dep.,

19   June 12, 2007, RT 25:8-15.)

20         82.  Plaintiff watched television two to four hours a day in the dorm by "cracking" the

21   drape over his bunk and looking through it.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT

22   57:19-58:9.)  He claimed that television does not affect his eyes because he is looking directly at

23   it; it only hurts if he turns his head and light "hits the side of his eye."  (Id.)  Plaintiff currently

24   watches television six hours a day in his cell.  (RT 61:5-23.)  That behavior indicated that he did

25   not have photophobia caused by a vision problem or ocular pathology, or any medical problem

26   triggered by light.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 103.)  The draping, coupled with

27   dark glasses, would have allowed very little light into his eyes.  (Id.)  Opening the drapes to watch

28   television is not behavior aimed at avoiding light.  (Id.)  And the brightness of the lighting in the

1   dorm was virtually the same as the lighting in the Wing I-1 cell from which he had moved.  (Id.;

2   Defs.' Ex. F, ¶¶ 11-14.)

3        83.  On January 27, 2005, plaintiff was moved from Wing J-3 to a lower bunk (P-139L)

4   in a dayroom on Wing P-1, which had been converted to a dorm.  (Defs.' Ex. E, Weaver Decl.,

5   ¶16; Defs.' Ex. K, Thomas Interrog. Resp. No. 1; Defs.' Ex. A, Pl.'s Dep., June 12, 2007,

6   RT 117:21-118:9.)  Like the earlier move, this housing change was also made because of the

7   housing unit closures and conversions being made at the time.  (Pl.'s Summ. Judg. Mot, July 12,

8   2012, Attach. E [Dickinson Decl.], ¶ 16; Defs.' Ex. K, Thomas Interrog. Resp. No. 1.)

9        84.  Plaintiff still did not have a medical chrono that precluded him from being housed in

10   a dorm, and that required him to be housed in a cell with tinted windows.  There is also no

11   evidence that Sergeant Thomas or Captain Moreno were responsible for this change in

12   plaintiff's housing assignment.

13        85.  The same day plaintiff moved to the P-1 dorm, Captain Moreno authored a

14   memorandum that ordered staff to leave the lights on from 8:00 a.m. to 10:00 p.m. each day all

15   dorms in Unit I to ensure adequate safety for staff and inmates and institutional security.  (Defs.'

16   Ex. L, Moreno Interrog. Resp. No. 1, Attach. 3.)  Plaintiff did not talk to Captain Moreno in

17   January 2005 about his claimed intolerance of light.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT

18   120:22-25.)  Captain Moreno did not know that plaintiff was in a Unit I dorm when the memo

19   was issued, and plaintiff did not have a medical chrono which stated that he could not be housed

20   in a dorm or subjected to general lighting in his housing for medical reasons.  (Id.)  According to

21   plaintiff, Captain Moreno only knew that Dr. Bick wanted him to wear the goggles he had gotten

22   from B-2 Supply for his reported light tolerance problem.  (Id. RT 120:4-16.)

23        86.  On February 4, 2005, Dr. McAllister recommended, and Dr. Bick approved, a

24   medical chrono for dark glasses from B-2 Supply and window tint "consistent with CMF

25   regulations" for proliferative diabetic retinopathy and photophobia.  (Defs.' Ex. C, Hinman-

26   Seabrooks Decl., ¶ 79.)  The dark glasses were goggles that were to be worn over plaintiff's

27   eyeglasses.  (Id.)  The goggles were intended to address plaintiff's claim that his dark prescription

28   glasses were not adequate because they let some "peripheral" light in through the tops, bottoms,

1   and sides.  (Id.)  Plaintiff, however, complained that the goggles did not fit well over his

2   eyeglasses and still let in some light, so he insisted that he still needed to be housed in a cell with

3   tinted windows.  (Id.)  Plaintiff had no vision problem or ocular pathology that required

4   sunglasses, dark prescription eyeglasses, dark-tinted goggles, and cell housing with window

5   tinting.  This medical chrono was not medically necessary.

6        87.  On March 10, 2005, Dr. Hinman-Seabrooks saw plaintiff for evaluation of his

7   diabetic neuropathy.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 80.)  She noted that he was an

8   insulin-dependent diabetic who had received laser surgery on both eyes.  (Id.)  His corrected

9   vision with eyeglasses was 20/25 in both eyes.  (Id.)  A dilated fundus exam showed no evidence

10  of active diabetic retinopathy.  (Id.)  Dr. Hinman-Seabrook's' plan was to see him for follow-up

11  in six months for a repeat dilated eye examination and to refer him to an optometrist for an update

12  on his eyeglasses prescription.  (Id.)  Dr. Hinman-Seabrooks noted that plaintiff had requested a

13  medical chrono for dark sunglasses, but found that he had no ocular pathology to indicate a need

14  for them.  (Id.)  Dr. Hinman-Seabrooks found that a patient who had undergone the amount of

15  panretinal photocoagulation he had received typically has dimming of vision at all times, not

16  photophobia (increased sensitivity to light).  (Id.)  When questioned, plaintiff complained that

17  he got severe headaches in sunlight and with room lights.  (Id.)  There was no ocular pathology to

18  support that claim, so Dr. Hinman-Seabrooks referred plaintiff to a neurologist for evaluation

19  of whether there could be another cause for his headache complaint.  (Id.)

20       88.  On May 16, 2005, Dr. Capozzoli, the neurologist, saw plaintiff for a complaint of

21  "exacerbation" of "migraine headaches" secondary to being moved to a dorm in December 2004

22  and the fact that custody staff required the lights to be on in the Unit I dorms from 8:00 a.m. to

23  10:00 p.m. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 81.)  Plaintiff reported that he had been

24  allowed to tint the windows in his cell.  (Id.)  Plaintiff claimed that he had been doing well

25  taking zolmitriptan for his headaches, but that it no longer helped because of the increased

26  frequency of the headaches.  (Id.)  Dr. Capozzoli noted that plaintiff was wearing dark

27  eyeglasses, was in no apparent distress, had early cataracts, and had stable ophthalmological

28  reflexes.  (Id.)  Dr. Capozzoli noted that the examination was consistent with his previous

examination of plaintiff. (Id.) Dr. Capozzoli diagnosed exacerbation of migraines associated with the change in housing from a cell to a dorm and ordered topiramate (Topamax), 25 mg., b.i.d. for seven days, then 50 mg., b.i.d. for 30 days for migraine prophylaxis, with a maximum weekly dosage of 200 mg. (Id.) That medication is given to prevent migraine headaches from occurring. (Id.) Dr. Capozzoli also wrote a medical chrono recommending dark glasses and cell housing with window tinting for, among other reasons, diabetic retinopathy and "vascular headaches with photophobia." (Id.) There was no vision problem or ocular pathology to support a recommendation for cell housing with window tint for diabetic retinopathy or photophobia caused by ocular pathology that would trigger a migraine. (Id.) Dr. Bick properly changed that recommendation and made it a request for cell-based housing, and emphasized that it was subject to custody and institutional safety requirements. (Id.)

89. On June 13, 2005, Dr. Capozzolli saw plaintiff for follow-up. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 82.) Dr. Capozzoli found that he was not "photophobic" and was neurologically stable. (Id.) He changed the dose of a medication that had been ordered as a prophylactic to prevent plaintiff's claimed migraines. (Id.) Plaintiff complained that he was still housed in a dorm, rather than a cell, and was trying to work it out through channels. (Id.)

90. On July 13, 2005, Dr. Capozzolli saw plaintiff, who complained that the medical chrono for cell housing with window tinting had been denied by custody staff because it was a recommendation, rather than a medical order. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 83.) Dr. Capozzolli told plaintiff to appeal the decision because it was a medical recommendation and was a "strong recommendation" that Dr. Capozzoli would support if asked by a classification committee (Id.) Dr. Capozzoli noted that plaintiff was in no apparent distress, was wearing dark glasses, and was neurologically stable. (Id.) Plaintiff had no vision problem or ocular pathology to support Dr. Capozzoli's "medical recommendation" for cell housing with window tint, or to explain headaches triggered by or caused by light, even when plaintiff was wearing dark glasses. (Id.)

/////

91.  On October 25, 2005, Dr. Calvo and Dr. Andreasen approved a Disability Placement Program Verification (DPPV) (CDCR 1845) that did not provide for cell housing with window tint as a disability accommodation for plaintiff's vision impairment.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 84.)

92.  On November 10, 2005, Dr. Hinman-Seabrooks saw plaintiff for follow-up, noted that he had an early cataract and stable proliferative diabetic retinopathy following panretinal photocoagulation, and found that "subjective photophobia" complaint was not consistent with his examination.  (Defs.' Ex. C, Hinman-Seabrooks Decl., Attach. 1, HS 139-140.)

93.  On December 13, 2005, plaintiff was moved from a dorm bed in Wing P-1 to a dorm bed (H-342L) in Wing H-3.  (Defs.' Ex. E, Weaver Decl., ¶ 17.)

94.  On February 16, 2006, Nurse Practitioner Tayo-Samoni recommended, and Dr. Bick approved, a medical chrono for CMF-approved dark glasses and window tint in his housing consistent with prison regulations because of proliferative diabetic retinopathy and photophobia. (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 87.)  There was no medical necessity for this chrono, and certainly not for both dark glasses and cell housing with window tint, because of plaintiff's early cataract.  (Id.)  Plaintiff had no other vision problem or ocular pathology to support a medical chrono based on proliferative diabetic retinopathy or photophobia.  (Id.)

95.  On March 2, 2006, plaintiff was seen by Dr. Hsueh in Internal Medicine.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 88.)  Plaintiff claimed that light "triggered" migraines, that he had been able to "control the environment" when he was in a single cell, and asked that he be placed in a single cell. (Id.)  Dr. Hsueh found that plaintiff was in no apparent distress and was not photophobic.  (Id.)  Plaintiff had no vision problem or ocular pathology to support his request to be housed in a cell with window tint.  Dr. Hsueh told plaintiff to continue using sunglasses and avoid exposure to light, but recommended no change in the February 16, 2006 medical chrono.  (Id.)

96.  On April 20, 2006, Dr. Hinman-Seabrooks saw plaintiff for an annual diabetic vision exam.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 89.)  She noted that his proliferative diabetic retinopathy following panretinal photocoagulation was stable, and that he had early

cataracts consistent with photosensitivity.  (Id.)  Plaintiff had dark glasses, which were sufficient

to manage any glare caused by the early cataracts.  (Id.)  He did not require cell housing with

tinted windows, and Dr. Hinman-Seabrooks did not recommend a medical chrono for such

housing.  (Id.)

97.  On January 26, 2007, Dr. McAllister recommended, and Dr. Bick approved, a

renewal of plaintiff's medical chrono for CMF-approved dark glasses and window tint consistent

with CMF regulations.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 90.)  Plaintiff did not have

vision problems or ocular pathology that required both dark glasses and cell housing with window

tint.  (Id.)

98.  On March 1, 2007, Dr. Hinman-Seabrooks saw plaintiff for evaluation of his

complaint of photophobia.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 91.)  She again found that

he had proliferative diabetic retinopathy with dense panretinal photocoagulation patterns after

surgeries that was stable, and that he complained of photophobia for which there was no

explanation.  (Id.)  Dr. Hinman-Seabrooks ordered a follow-up in six months.  (Id.)

99.  On March 20, 2007, plaintiff was moved to a cell (P-116L) in Wing P-1 to comply

with the preliminary injunction issued in Stringham v. Bick, et al., No. 2:05-cv-0644 FCD GGH

P, on March 15, 2007.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 92.)  Plaintiff did not have

vision problems or ocular pathology at the time that required cell housing with tinted windows.

(Id. ¶ 93.)

100.  On March 22, 2007, Dr. Hsueh saw plaintiff in the Internal Medicine Clinic.  (Defs.'

Ex. C, Hinman-Seabrooks Decl., ¶ 94.)  Plaintiff reported that he was housed in a cell

with a tinted window.  (Id.)

101.  On December 20. 2007, Dr. Hinman-Seabrooks saw plaintiff for interval diabetic

retinopathy evaluation.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 95.)  Plaintiff reported that

his "photophobia" had improved with use of dark sunglasses, but he had a couple of episodes of

blurred vision that he associated with elevated blood sugars.  (Id.)  Dr. Hinman-Seabrooks found

that plaintiff's proliferative diabetic retinopathy following panretinal photocoagulation in both

eyes remained stable, without evidence of active disease; that he had early cataracts, consistent

1    with elevated blood sugars, with fair visual acuity; and that he had unexplained photophobia that

2    was stable with the use of dark sunglasses.  (Id.)  Dr. Hinman-Seabrooks urged him to work with

3    his primary-care physician to improve his blood-sugar control and to follow-up with Dr. Hinman-

4    Seabrooks in six months.  (Id.)

5        102.  On June 19, 2008, Dr. Hinman-Seabrooks saw plaintiff for follow-up and noted that

6    he again complained of photophobia in both eyes that triggered migraines.  (Defs.' Ex. C,

7    Hinman-Seabrooks Decl., ¶ 96.)  She again noted that he had 360-degree panretinal

8    photocoagulation procedures, with no new activity, and ordered sunglasses, as needed, for his

9    unexplained complaints of photophobia and migraines triggered by light.  (Id.)  Dr. Hinman-

10   Seabrooks did not recommend a medical chrono for cell housing with window tint because

11   plaintiff had no vision problem or ocular pathology that required one, either as medical treatment

12   or a disability accommodation.  Dark glasses alone were sufficient.  (Id.)

13       103.  On February 5, 2009, Dr. Crosson, an ophthalmologist, saw plaintiff and noted that

14   he wore sunglasses indoors for photophobia and migraines.  (Defs.' Ex. C, Hinman-Seabrooks

15   Decl., ¶ 97.)  Dr. Crosson found, as Dr. Hinman-Seabrooks had, that plaintiff had heavy

16   panretinal photocoagulation, 360 degrees in both eyes, and no active retinopathy.  (Id.)

17       104.  On January 11, 2011, Dr. Crosson saw plaintiff and noted that he again reported

18   photophobia following panretinal photocoagulation in both eyes, but that his sunglasses helped.

19   (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 98.)  Dr. Crosson found that his proliferative diabetic

20   retinopathy was stable and recommended sunglasses, with a follow-up in six months.  (Id.)  He

21   did not recommend cell housing with window tint.  (Id.)

22       105.  On August 18, 2011, Dr. Crosson saw plaintiff, found that he was still stable,

23   approved sunglasses, and ordered a follow-up in nine months.  (Defs.' Ex. C, Hinman-Seabrooks

24   Decl., ¶ 99.)  Dr. Crosson did not recommend cell housing with window tint.  (Id.)

25       106.  On November 4, 2011, Dr. Mathis saw plaintiff and discussed his request for his

26   own blood sugar finger stick machine that had not been approved at CDCR "state level."  (Defs.'

27   Ex. D, Barnett Decl., Attach. 1, BB 271.)  Plaintiff wanted his own testing device so he would not

28   have to leave his cell to go to the B-1 Clinic several times a day for blood sugar checks because

33

1   he claimed that he spent a lot of time in the bright lights of the B-1 Clinic waiting to have his

2   glucose checked and that he had a court order for tinted-window housing.  (Id.)  Dr. Mathis told

3   him that the public areas, such as the B-1 Clinic, were not the same as the cell covered by the

4   court order.  (Id.)  Plaintiff said he wanted his medical chrono to have the language that he should

5   avoid brightly lit areas "as much as possible" removed so that it would an absolute prohibition on

6   exposure to "brightly lit areas."  (Id.)  Dr. Mathis discussed moving plaintiff to the Outpatient

7   Housing Unit (OHU), but plaintiff said he did not want to go and that he could not be in a dorm,

8   like D-Dorm, because of the light.  (Id.)

9       107.  Dr. Mathis had a similar discussion with plaintiff the following month on December

10   5, 2011.  (Defs.' Ex. D, Barnett Decl., Attach. 1, BB 274.)

11       108.  On February 7, 2012, Dr. Mathis saw plaintiff and noted that he could walk 500

12   yards from his housing in V Wing to the medical clinic and back without stopping.  (Defs.' Ex. C,

13   Hinman-Seabrooks Decl., ¶ 101.)  Dr. Mathis noted that plaintiff was on Oscal D (calcium and

14   Vitamin D supplement) for Vitamin D deficiency, which can cause bone pain and muscle

15   weakness and have adverse effects on diabetes, glucose intolerance, and hypertension, all of

16   which plaintiff had.  (Id.)  Plaintiff's self-imposed limitation on exposure to sunlight, and light in

17   general, is a cause of the deficiency that requires the supplements to counter the adverse effects of

18   his poor health choices.  (Id.)

19       109.  On October 2, 2012, plaintiff told Dr. Mathis that he has a Court order for "tinted

20   window housing" and that "there is no state approved device that can shut out the light

21   sufficiently."  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 104.)

22       110.  On October 31, 2012, Dr. Mathis noted that he was uncertain about plaintiff's light

23   sensitivity complaints, and that plaintiff tolerated light in the clinic.  (Defs.' Ex. C, Hinman-

24   Seabrooks Decl., ¶ 105.)

25       111.  Plaintiff does not have vision problems or ocular pathology to explain his light

26   sensitivity complaints.  (Defs.' Ex. C, Hinman-Seabrooks Decl., ¶ 104.)  His demand to be

27   housed in a cell with tinted windows (in addition to using sunglasses, dark prescription glasses,

28   and dark goggles) is not supported by medical necessity or a need to accommodate photophobia

caused by a vision impairment or ocular pathology.  (Id.)  The facts indicate that plaintiff has

successfully used his vision impairment for secondary gain, that is, to obtain medical chronos and

a court order for cell housing with window tinting because he prefers being housed in a cell,

rather than a dorm.  (Id.)

**B. Migraines Caused by Dorm Lighting.**

112.  Diagnosis of migraine headache is made by a medical history of migraine-related

symptoms, physical examination, and, if necessary, test to rule out other causes.  A family history

of migraines is important because 70 to 80% of migraine sufferers have a family history of

migraine headache.  (Defs.' Ex. D, Barrett Decl., ¶ 12.)  The physical examination of a patient

with migraine headache in between attacks of migraine will not show any organic causes for the

headaches.  (Id.)  Tests such as a CT scan or MRI can only rule out the lack of an organic cause.

(Id.)  A diagnosis of migraine is usually made on the basis of repeated attacks (at least 5) that

meet the following criteria:  1) headache attacks that last four to 72 hours; 2) headache has at least

two of the following characteristics - location on one side of the head, throbbing pain, moderate

or severe pain intensity, pain worsened by normal physical activity (walking, climbing stairs); 3)

during the headache, the patient experiences one or both of the following characteristics - nausea

or vomiting or extreme sensitivity to light or sound; 4) headache cannot be attributed to another

disorder.  (Id.)  In a migraine, sensitivity to light occurs after the onset of a headache and while it

is going on; light sensitivity does not cause the headache, but may make it worse once it has

occurred.  There is currently no test to confirm that a doctor's diagnosis of migraine headache

based on a patient's subjective report.  (Id.)  For that reason, it is important that a doctor

evaluating a patient for migraine headaches not only obtain the necessary history, but also

confirm the patient's subjective reports against objective evidence, and carefully follow the

patient's response to medication for to treat or prevent migraine headache.  (Id.)  That is

especially important in a correctional institution because prisoners often feign and falsely report

medical symptoms for secondary gain, that is, to obtain desired medications or other perceived

benefits, such a preferred housing assignment.  (Id.)  Examples of such secondary benefits include

dark glasses, wheelchairs, or canes or ambulatory aids that identify the prisoner as vision or

1   mobility impaired because, in the prison culture, those inmates are at a lower risk of attack from

2   other prisoners.  (Id.)  Cell housing, and particularly a single cell, is often sought for that same

3   reason, and because it is viewed as providing greater protection for an inmate's property.  (Id.)

4         113.  Plaintiff's medical record contains no significant history of headaches and,

5   particularly, no history of migraines, until after he was moved from a cell to a dorm in April

6   1999.  (Defs.' Ex. D, Barrett Decl., ¶ 13.)  Before that date, plaintiff's sporadic reports of

7   headache did not indicate they were migraines, and he was treated with common remedies for

8   headaches, such as aspirin, acetaminophen, ibuprofen, and muscle relaxants for muscle tension

9   with good results.  (Id.)  In fact, plaintiff's complaints of pain were predominantly associated with

10  bone or muscle pain.  (Id.)  And, the notes of ophthalmologists, who saw him for complaints of

11  photophobia aggravated by proliferative diabetic retinopathy, do not show that he had headaches

12  triggered by a vision problem or ocular pathology, even when wearing his sunglasses or

13  prescription dark glasses.

14        114.  On April 22, 1999, plaintiff was moved from the upper bunk in a cell (I-126U) to a

15  lower bunk in a dorm (P-142L) in Wing P-1.  (Defs.' Ex. E, Weaver Decl., ¶ 10.)

16        115.  A month later, on May 28, 1999, plaintiff claimed that he needed an upper bunk

17  because he was "claustrophobic," and that he needed cell housing because he was photophobic

18  and could not tint the windows in the dorm to which he was assigned.  (Defs.' Ex. D, Barrett

19  Decl., ¶ 14.)  Dr. Gordon handwrote a medical chrono for plaintiff to receive an upper bunk for

20  claustrophobia and cell housing with tinted windows for photophobia.  (Id.)  There is no medical

21  basis for this chrono, and no evidence that it was approved by the Chief Medical Officer in a

22  typewritten order, as required.  Plaintiff's claim of claustrophobia is not supported by medical

23  evidence; he simply did not want to be housed in a dorm, as evidenced by his report on

24  September 22, 1999, that he was "stressed" by the problems caused by "group living."  (Id.)

25  Plaintiff did not have photophobia because of vision problems or ocular pathology that required

26  housing in a cell with tinted windows.  (Defs.' Ex. D, Barrett Decl., ¶ 14.)  And no doctor had

27  found that he had photophobia from another cause.  (Id.)  Dr. Gordon gave plaintiff the medical

28  chrono he requested, without regard to whether there were medical reasons for it.  (Id.)  That was

1  not appropriate because CMF had a high demand to house inmates with high security levels and

2  medical or mental health needs in the limited number of available cells.  (Id.)  Medium custody

3  inmates, like plaintiff, who did not have a medical need for cell housing were often moved to

4  dorms when cell housing was needed.  (Id.)  An inmate should not be given a medical chrono for

5  cell housing without a medical need, based on a preference for cell housing because doing so

6  limits the ability of medical and correctional staff to properly house those inmates who truly

7  needed cells for medical or security reasons in them.  (Id.)

8  116.  On February 23, 2000, plaintiff was seen by Dr. Burr in the diabetes clinic.  (Defs.'

9  Ex. D, Barnett Decl., ¶ 15.)  Dr. Burr noted that plaintiff was regularly followed in the B-1 clinic

10  by Dr. Geraghty.  (Id.)  Plaintiff complained of headaches from photophobia.  (Id.)  That is the

11  first reference in plaintiff's medical record to headaches triggered by photophobia, but there is no

12  diagnosis of the cause of the photophobia.  (Id.)  Dr. Burr noted that plaintiff had "shaded"

13  eyeglasses that had been on order for four months and a medical chrono for dark glasses

14  secondary to laser surgery, but he did not find that plaintiff had migraines triggered by bright

15  light, and he ordered no changes in plaintiff's treatment regimen.  (Id.)

16  117.  Plaintiff was moved from the dorm to an upper bunk (I-134U) in Wing I-1 on

17  August 18, 2000, but was moved back to a lower bunk in a dorm (P-142L) on August 22, 2000,

18  where he remained until December 18, 2000, when he was moved to a lower bed in a cell (I-

19  134L) in Wing I-1.  (Defs.' Ex. E, Weaver Decl., ¶¶ 11-12.)  Plaintiff was seen by doctors on a

20  number of occasions during the time he was in a dorm, but his medical records do not show that

21  he had migraines triggered by bright lights in the dorm during any of this period of time.  (Defs.'

22  Ex. D, Barnett Decl., ¶ 16.)  Migraines are not typically triggered by bright lights, rather after

23  they start patients report seeing bright lights that makes the headache worse.  (Id.)

24  118.  Except for a brief time when plaintiff was housed in a single cell (W-121) in

25  administrative segregation in Wing W-1 (Willis Unit) from March 1 to May 13, 2003, he was

26  assigned to the lower bunk (I-137L) in a double cell on Wing I-1 until December 17, 2004.

27  (Defs.' Ex. E, Weaver Decl., ¶¶ 13-14.)

28  /////

119.  On May 25, 2001, Dr. Altchek saw plaintiff, who complained of photophobia and headaches and asked for "something stronger than Motrin."  (Defs.' Ex. D, Barnett Decl., ¶ 18.)  At the time, plaintiff was receiving ibuprofen (Motrin), 800 mg., twice a day, as needed, for pain associated with his Charcot foot and peripheral neuropathy, not for headaches caused by photophobia.  (Id.)  Dr. Altchek did not take a history needed to diagnose migraines, noted that plaintiff had sunglasses, and ordered tramadol (Ultram), 100 mg., q.i.d. (four times a day), as needed for headache pain for 45 days.  (Id.)  Tramadol is an opiate-type medication that can be habit-forming, and that is used to treat chronic moderate to severe pain.  (Id.)  It is not FDA approved for the treatment of migraine, but is sometimes prescribed "off label" for that purpose.  (Id.)  The order was not based on a documented diagnosis of migraines, and it is likely that Dr. Altchek ordered the medicine for relief of plaintiff's chronic pain from other causes that he thought might be causing the headaches.  (Id.)  Plaintiff later reported that tramadol gave him headaches.  (Id.)

120.  On July 2, 2001, Dr. Altchek saw plaintiff, who again complained of "migraine" headaches.  (Defs.' Ex. D, Barnett Decl., ¶ 19.)  Dr. Altchek again did not diagnose migraines triggered by bright lights, but simply renewed medications and a medical chrono for cell housing with window tint.  (Id.)

121.  On January 28, 2002, Dr. Altchek saw plaintiff for a medication check and noted that plaintiff wanted indomethacin (Indocin), rather than Motrin, for foot pain after a fall.  That medical problem is discussed below in connection with his Charcot foot problem.  (Defs.' Ex. D, Barnett Decl., ¶ 20.)  Dr. Altchek discontinued tramadol and Motrin and ordered Indocin, 50 mg., three times a day, as needed, for 90 days.  (Id.)  Dr. Altchek also ordered migrapap (Midrin), two tablets, twice a day, as needed, for 30 days.  (Id.)  Midrin is a combination of isometheptene mucate, dichloralphenazone, and acetaminophen.  It is a medication given for either migraine or tension headaches.  (Id.)  Dr. Altchek did not explain his reason for ordering that medication.  (Id.)  Because his note does not include a diagnosis of migraines triggered by bright light, it is likely that he ordered Midrin for tension headaches associated with plaintiff's chronic pain from other causes associated with his diabetes.  (Id.)  Plaintiff's medical records show that

1    Midrin was renewed without any evaluation of its efficacy until it was stopped in March 2004,

2    and that  plaintiff took the medication sporadically, and no more than two or three times a

3    month.  (Id.)  He took the medication even though he was housed in a cell at the time, and had

4    sunglasses and dark prescription glasses, therefore, the reported headaches could not have been

5    triggered by dorm lighting because plaintiff was not housed in a dorm at the time he was taking

6    the Midrin.  (Id.)

7         122.  Plaintiff's medical record does not show complaints of headaches or a migraine

8    diagnosis between the January 28, 2002 visit and February 15, 2003.  (Defs.' Ex. D, Barnett

9    Decl., ¶ 21.)

10        123.  On February 15, 2003, plaintiff complained of pain on the left side of his face, a

11   swollen face, a "migraine" headache, hot flashes, and photosensitivity.  (Defs.' Ex. D, Barnett

12   Decl., ¶ 22.)  Dr. Altchek found that he had a probable dental abscess in his left upper jaw.  (Id.)

13   A headache secondary to pain caused by a tooth abscess is not a migraine.  (Id.)

14        124. On April 23, 2003,  plaintiff told a doctor that he could not go to the yard because

15   "his eyeglasses were broken," not because he got migraine headaches triggered by bright light

16   when wearing sunglasses or dark prescription eyeglasses.  (Defs.' Ex. D, Barnett Decl., ¶ 23.)

17        125.  On July 31, 2003, plaintiff complained of headaches and that he did not tolerate

18   tramadol because it gave him headaches.  (Defs.' Ex. D, Barnett Decl., ¶ 24.)  The doctor decided

19   to try gabapentin, but that is not a medication for migraines.  (Id.)  Despite plaintiff's reported

20   intolerance of tramadol, doctors continued to order it for him, and plaintiff took tramadol on the

21   same day as Midrin on various occasions between September 2003 and February 2004.  (Id.)

22        126.  On August 5, 2003, Dr. Capozzoli saw plaintiff for an eletromyelography and

23   nerve conduction study (EMF/NCS) for pain associated with Charcot foot and peripheral

24   neuropathy.  (Defs.' Ex. D, Barnett Decl., ¶ 25.)  Plaintiff did not report migraines triggered by

25   bright light at that time, and Dr. Capozzoli did not diagnose migraines.  (Id.)

26        127.  On March 9, 2004, Dr. Crapotta recommended, and Dr. Bick approved, a medical

27   chrono for "CMF-approved dark glasses."  (Defs.' Ex. D, Barnett Decl., ¶ 26.)  Dr. Bick lined

28   out, and did not approve Dr. Crapotta's recommendation for "window tint on cell windows,

consistent with California Medical Facility regulations," because the window tint, in addition to the dark glasses, was not medically necessary.  (Id.)  Plaintiff had no vision problems or ocular pathology to explain his photophobia claims.  (Id.)  And he did not have a diagnosis of migraines that required cell housing with tinted windows.  (Id.)  The medical chrono approved by Dr. Bick correctly did not direct correctional officers to house plaintiff in a cell with tinted windows for medical reasons, and that chrono gave the officers discretion to move  plaintiff to a dorm if higher security prisoners needed cell housing.  (Id.)

128.  On March 25, 2004, plaintiff complained of "migraines" with "band-like pressure," but he had no pain when seen by a doctor.  (Defs.' Ex. D, Barnett Decl., ¶ 27.)

129.  On April 12, 2004, Dr. Capozzoli, a consulting neurologist, saw plaintiff in response to a March 25, 2004 referral from Dr. Andreasen, for what plaintiff claimed were migraines, but that Dr. Andreasen felt were tension headaches.  (Defs.' Ex. D, Barnett Decl., ¶ 28.)  At the time, plaintiff was housed in a cell (I-137L) on Wing I-1; he was not in dorm, so his reported headaches could not have been triggered by bright lights in the dorm.  (Id.)  Plaintiff claimed that he had experienced "migraines" for many years since laser surgery for diabetic retinopathy because of his light sensitivity.  (Id.)  There is no ocular pathology to explain this report, and plaintiff did not have photophobia caused by diabetic retinopathy that was exacerbated by prior laser surgeries.  (Id.)  Dr. Capozzoli, nevertheless, found that plaintiff was positive for photophobia based only on plaintiff's subjective report.  (Id.)  Plaintiff claimed that the headaches were usually, but not always, right-sided; were in the temporal area; and were accompanied by nausea, without vomiting, and by kinetophobia (fear of motion).  (Id.)  Those could be symptoms of migraine headache, but Dr. Capozzoli did not confirm them against plaintiff's medical record, which did not show a history of those symptoms on the few previous occasions that he had reported headaches.  (Id.)  Plaintiff said he did not have migraine headaches before the laser surgeries, but had them fairly infrequently (three or four a year) in a "bad year," but other years only once or twice, after the surgeries "because he was in cells with window tint."  (Id.; Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 98:16-20; RT 99:16-20.)  But that was untrue because plaintiff was also housed in a dorm after the surgeries.  (Defs.' Ex. E, Weaver Decl., ¶¶10, 12.)  Dr. Capozzoli

1   apparently was not aware of these inconsistencies, and plaintiff's medical record does not contain

2   evidence of migraines four times a year before, or after the panretinal photocoagulation

3   procedures.  (Id.)  In any event, the migraines, if true, were so infrequent, as Dr. Capozzoli found,

4   that they could have been managed with medication.  He did not order cell housing with window

5   tinting for migraines caused by photophobia.  (Defs.' Ex. D, Barnett Decl., ¶ 28.) Plaintiff

6   reported that that he used Midrin and Tylenol (acetaminophen), with some benefit, but that he

7   usually had to just let the headache resolve itself over the course of the day.  (Id.)  Plaintiff said

8   he had heard about sumatriptan (Imitrex) and wanted to try it.  (Id.)  Sumatriptan is a medication

9   in the triptan family that is a first-line treatment of moderate to severe migraine headache that is

10  taken at the onset of the headache.  (Id.)  Its use in patients with uncontrolled diabetes and

11  hypertension is to be either avoided or provided with caution requiring careful monitoring by a

12  doctor.  (Id.)  Sumatriptan is a "hot" medication that is given only under "direct observation

13  therapy" (DOT) by nursing staff.  (Id.)  Plaintiff's request for that medication indicates that he

14  had read or been told about the symptoms of migraines and its treatment.  (Id.)  Dr. Capozzoli

15  noted that plaintiff was an insulin-dependent diabetic, but did not confirm whether it was

16  controlled.  (Id.)  Plaintiff's medical record showed that he was often not compliant with his

17  diabetes treatment medication, and that his diabetes was often uncontrolled.  (Id.)  Dr. Capozzoli

18  noted that plaintiff was negative for hypertension (HTN), but his medical record shows that he

19  took enalapril, a medication for hypertension.  (Id.)  Dr. Capozzoli did not note whether there was

20  a history of migraine headache in plaintiff's family.  In spite of these failures, Dr. Capozzoli

21  found that plaintiff had migraines, but that they were not frequent enough to justify daily

22  prophylactic treatment.  (Id.)  He ordered zolmitriptan (Zomig) with strict limitations. (Id.) The

23  medication was to be given 2.5 mg., as needed for headache, and could be repeated in two hours,

24  but a maximum of 5 mg. could be given in a week.  (Id.)  The order was for 90 days.  (Id.)

25  Zolmitriptan is another newer medication in the triptan family that is used to treat the onset of

26  migraine headaches.  It is not a prophylaxis that prevents migraines.  (Id.)  Dr. Capozzoli did not

27  recommend a medical chrono for a cell housing with window tinting.  (Id.)

28  /////

41

130.   Although Dr. Capozzoli ordered a follow-up in eight weeks and strict limitations on the zolmitriptan order, plaintiff's medical history does not show that Dr. Capozzoli saw him for the eight-week follow-up and did not monitor his use of zolmitriptan to determine whether he had migraines that were managed by the medication.  (Defs.' Ex. D, Barnett Decl., ¶ 29.)  The order for zolmitriptan was simply renewed by other doctors at ninety-day intervals.  (Id.)  Medication administration records, however, show that plaintiff rarely if ever took zolmitriptan when he was assigned to cell housing, and did not take it often until February 2005.  (Id.)

131.   Plaintiff was moved from his bed (I-137L) in a double-cell in Wing I-1 to a bed (J-353L) in a dorm on Wing J-3, and finally to a bed (P-139L) in a dorm on Wing P-1 on January 27, 2005.  (Defs.' Ex. E, Weaver Decl., ¶¶ 14-16.)  One of the reasons he moved was because prison officials shut down Wing P-2 housing for some reason, and one the inmates in that housing unit was placed in plaintiff's bed.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 117:21-118:9.)  The other was because he was a Medium Custody inmate who did not have a current medical chrono for cell housing.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 23:5-10.)

132.   The prisoner, who moved into plaintiff's bed in I-Wing, was a Close-Custody prisoner serving a life term.  (Defs.' Ex. K, Thomas Interrog. Resp. No. 1.)  Prison regulations required that Close-Custody inmates be housed in cells for safety and security reasons.  (Id.)  Plaintiff was a Medium Custody inmate who could be housed in a dorm.  (Id.)  He did not have a medical chrono at that time, which advised correctional staff that he had to be housed in a cell with tinted windows for medical reasons. (Id.)

133.   Two weeks before, on January 11, 2005, plaintiff asked for sumatriptan for "stress" that was "triggering a migraine again" after he moved to a dorm.  (Defs.' Ex. D, Barnett Decl., ¶ 30.)  Photophobia is not reported as the trigger for the claimed migraines.  (Id.)

134.   Shortly after plaintiff moved to the Wing P-1 dorm, he started taking zolmitriptan several times a day, but in more than the weekly maximum amount that had been prescribed.  (Defs.' Ex. D, Barnett Decl., ¶ 31.)  Taking that medication in more than the maximum weekly amount can cause overuse headaches.  (Id.)  The change in housing and lighting in the dorms does not explain this sudden increase in his taking of the medication, which was likely done for

1    secondary gain to justify cell housing.  (Id.)

2          135.  On February 4, 2005, Dr. McAllister recommended, and Dr. Bick approved, a

3    medical chrono for dark glasses from B-2 Supply and window tint "consistent with CMF

4    regulations" for proliferative diabetic retinopathy and photophobia.  (Defs.' Ex. D, Barnett Decl.,

5    ¶ 32.)  The dark glasses were goggles that were to be worn over plaintiff's eyeglasses.  (Id.)

6    The goggles were intended to address plaintiff's claim that his dark glasses were not adequate

7    because they let some "peripheral" light in through the tops, bottoms, and sides.  (Id.)  Plaintiff,

8    however, complained that the goggles did not fit well over his eyeglasses and still let in some

9    light, so he insisted that he still needed to be housed in a cell with tinted windows.  (Id.)

10         136.  On March 10, 2005. Dr. Hinman-Seabrooks found that plaintiff had no ocular

11   pathology to explain his photophobia claims and referred him to a neurologist to determine if

12   there could be another reason for that reported symptom.  (Defs.' Ex. D, Barnett Decl., ¶ 33.)

13         137.  On May 16, 2005, Dr. Capozzoli saw plaintiff, who complained that he had an

14   "exacerbation" of "migraine headaches" after moving to the dorms in December 2004, and where

15   custody staff required the lights to be on from 8:00 a.m. to 10:00 p.m.  (Defs.' Ex. D, Barnett

16   Decl., ¶ 34.)  Plaintiff claimed that he had been doing well taking zolmitriptan for his headaches,

17   but that it no longer helped because of the increased frequency of the headaches.  (Id.)  Plaintiff's

18   records showed that he had rarely taken zolmitriptan before moving to the dorms.  (Id.)  Dr.

19   Capozzoli noted plaintiff was wearing dark eyeglasses, was in no apparent distress, had early

20   cataracts, and had stable ophthalmological reflexes.  (Id.)  Dr. Capozzoli noted that his

21   examination was consistent with his previous examination of plaintiff the year before.  (Id.)

22   Dr. Capozzoli diagnosed exacerbation of migraines associated with the change in housing from a

23   cell to a dorm based solely on plaintiff's subjective report.  (Id.)  There is no objective medical

24   basis for Dr. Capazolli's diagnosis that the dorm lighting had caused an exacerbation of migraines

25   because the brightness levels in the two dorms that plaintiff had occupied were virtually the

26   same as the cell he had left, and the dorm he later moved to was less.  (Defs.' Ex. F, Vandermey

27   Decl., ¶¶ 11-14.)  And Dr. Capozzoli did not consider that plaintiff's headaches may have been

28   caused by use of zolmitriptan in weekly doses above the maximum he had ordered.  (Id.)  Dr.

1  Capozzoli ordered topiramate (Topamax), 25 mg., twice a day. for seven days, then 50 mg., twice

2  a day for 30 days for migraine prophylaxis, with a maximum weekly dosage of 200 mg.  (Id.)

3  Topirimate is given to prevent migraine headaches from occurring; it is not to be taken at the

4  onset of a headache, and is not effective when taken that way.  (Id.)

5        138.  Dr. Capozzoli also wrote a medical chrono recommending dark glasses and cell

6  housing with window tinting for among other reasons, "vascular headaches" with photophobia.

7  (Defs.' Ex. D, Barnett Decl., ¶ 35.)  That recommendation is not supported by Dr. Hinman-

8  Seabrooks' finding that plaintiff had no ocular pathology to explain his photophobia complaint.

9  (Id.)  Dr. Capozzoli also did not explain why eyeglasses with tinted lenses were not sufficient to

10  manage plaintiff's early cataract, or consider that plaintiff's subjective reports of migraines

11  triggered by bright light was made for secondary gain to obtain cell housing.  (Id.)  Dr.

12  Capozzoli did not consider that plaintiff draped bedding over his lower bunk in the dorm to

13  minimize the light, but still watched television for two to four hours a day.  (Defs.' Ex. A,

14  Pl.'s Dep., June 12, 2007, RT 25:8-15; RT 57:19-58:9.)  For those reasons, Dr. Bick properly

15  crossed out Dr. Capozzoli's recommendation that plaintiff be housed in a cell because it was

16  "more conducive to accommodating his medical needs."  (Id.)  That is not a finding that

17  cell housing was necessary for medical reasons, but rather that it was a convenience that custody

18  staff could provide if cells were available and not needed for inmates with security or medical

19  needs.  (Id.)  In the absence of a valid medical need for cell housing, however, Dr. Bick correctly

20  modified the medical chrono to provide that correctional staff could assign him to cell or dorm

21  housing subject to custody and institutional safety requirements.  (Id.)  The medical chrono did

22  not require that he be housed in a dorm for medical reasons, and correctional officers responsible

23  for implementing it would not have believed that it mandated cell housing with tinted windows.

24  (Id.)

25        139.  On June 13, 2005, plaintiff saw Dr. Capozzoli and reported that topiramate, 50 mg.

26  made him feel "doped: so he had not taken it twice a day to prevent migraines, as prescribed, but

27  rather had taken it only on onset.  (Defs.' Ex. D, Barnett Decl., ¶ 36.)  Plaintiff claimed that it

28  worked that when he took it that way, and that it also helped his neuropathic pain.  (Id.)  There is

1    no medical evidence that topirimate is effective for migraines when taken as an onset medication,

2    or that it is effective for the treatment of neuropathic pain.  (Id.)  Plaintiff complained that he was

3    still in a dorm.  (Id.)  Dr. Capozzoli found that plaintiff was not photophobic, but continued

4    the topiramate, but a lower dose of 25, mg., twice a day, and instructed plaintiff that it should

5    be used as a prophylactic medication.  (Id.)

6        140.  On July 13, 2005, Dr. Capozzoli saw plaintiff, who reported that the topiramate

7    helped "a bit," that he had no problems, but that the medical chrono for cell housing had been

8    denied because it was a recommendation.  (Defs.' Ex. D, Barnett Decl., ¶ 37.)  Dr. Capozzoli told

9    plaintiff to appeal the decision because it was a "medical recommendation" and was a "strong

10    recommendation," which Dr. Capozzoli would support if asked by a classification committee.

11    (Id.)

12        141.  Plaintiff was moved from the dorm in Wing P-1 to a bed (H-342L) in Wing H-3

13    dorm on December 13, 2005.  (Defs.' Ex. E, Weaver Decl., ¶ 17.)  Plaintiff was moved because

14    prison officials were closing the temporary dorm in Wing P-1 to convert it to a dayroom or

15    television room, so plaintiff and the other inmates who had been in the Wing P-1 dorm were

16    moved to other housing units.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 24:7-15.)  His bed

17    was backed up against a wall between two windows.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012,

18    RT 79:8-16.)  As in the other dorms, he "tented" his lower bunk with bed sheets to block light

19    from the window.  (Id. RT 79:16-21.)  The brightness of the lights in the dorms plaintiff was in

20    was about the same, or less in the case of the Wing H-3 dorm, as that in the Wing I-1 cell he had

21    left.  (Defs.' Ex. F, Vandermey Decl., ¶¶11-14.)  The brightness level in the Wing J-3 and Wing

22    P-1 dorms was a little more than that produced by a sixty-watt incandescent bulb or a fifteen CFL

23    fluorescent bulb, and less than that in the Wing H-3 dorm.  (Id. ¶¶ 3, 11-14.)

24        142.  Between the July 15, 2005 visit with Dr. Capozzoli and February 5, 2006, plaintiff's

25    medical record shows that he did not complain of migraine headaches.  (Defs.' Ex. D, Barnett

26    Decl., ¶ 38.)  That day, plaintiff complained that he had "some dental work done" and that his

27    head hurt "like a migraine."  (Id.)  That is not a migraine.  (Id.)  Plaintiff was given 800 mg. of

28    ibuprofen and seen the following day when he reported having headaches for three days

1   with "photophobia." (Id.) Pain caused by dental work does not cause "photophobia." (Id.) On

2   examination, a doctor found tenderness over the right frontal and maxillary sinus areas, but no

3   areas of inflammation in the upper gums or adenopathy. (Id.) Plaintiff was continued on Tylenol

4   and topiramate, and a trial of tramadol (Ultram) was started, even though plaintiff had previously

5   complained, as discussed previously, that tramadol gave him headaches. (Id.)

6        143. On February 16, 2006, plaintiff complained of migraine headaches. (Defs.' Ex. D,

7   Barnett Decl., ¶ 39.) This time, plaintiff claimed that he had headaches "triggered by light,"

8   rather than a dental problem, and that his medications were not controlling them. (Id.)

9   Topiramate would not have prevented migraine headaches because plaintiff was not taking that

10   medication daily as he had been told to do. (Id.) The doctor who saw him, however, continued

11   topiramate, and added sumatriptan (Imitrex), one 50 mg. tablet at the onset of a headache, which

12   could be repeated in two hours, as needed, with a maximum daily dose of 200 mg. (Id.) Plaintiff

13   was also referred him for further evaluation by in the Internal Medicine Clinic. (Id.)

14        144. Plaintiff took sumatriptan once or twice a day for several days in February 2006, and

15   then began taking it every day beginning March 8, 2006, four times a day, in the maximum daily

16   dose that had been ordered. (Defs.' Ex. D, Barnett Decl., ¶ 40.) That pattern continued with

17   plaintiff taking sumatriptan three or four times a day, every day of the week, and every day of the

18   month, even though the brightness of the lighting in the dorm he was in was less than

19   in the I-Wing cell he had left. (Id.) Plaintiff continued to overuse sumatriptan until March 20,

20   2007, the day he was moved to a cell to comply with a court-ordered preliminary injunction in

21   Stringham v. Bick, et al., 2:05-cv-0644 FCD GGH P, Order filed Mar. 15, 2007( ECF No. 43).)

22   (Id.) His use of sumatriptan dropped precipitously as soon as he got the cell he had been

23   demanding. (Id.) Plaintiff took sumatriptan only once or twice a day for several weeks and then

24   not at all or only one time a month. (Id.) Plaintiff stopped taking sumatriptan for migraines

25   shortly after he moved into the cell in March 2007. (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT

26   9:17-10:10.) This sudden change cannot be explained by plaintiff's transfer to a cell, but rather

27   reflects his use of the medication to get his way and justify his need for the cell.

28   /////

145.  Plaintiff should not have taken sumatriptan as frequently as he did before the transfer to a cell.  (Defs.' Ex. D, Barnett Decl., ¶ 41.)  The order should have contained a maximum weekly dose, as well as a maximum daily dose.  (Id.)  In January 2009, a maximum weekly dose was ordered, which limited plaintiff to ten 50 mg. tablets a week.  (Id.)  He had taken far more than that in the months preceding his transfer to a cell in March 2007.  (Id.)  Taking sumatriptan in the amount and frequency plaintiff did can cause a cycle of headaches due to overuse of the medication.  (Id.)  Plaintiff was not taking the topiramate, as directed, to prevent migraines and was overusing sumatriptan to stop headaches, and instead causing a cycle of headaches by the overuse.  (Id.)

146.  Plaintiff did not have migraines that were triggered by the brightness of the lights in the dorms in which he was housed from December 17, 2004, to March 20, 2007, and he does not have migraines caused by exposure to other brightly lit areas of the prison at this time, as indicated by his willingness to be in brightly lit areas when it is somewhere he wants to be , e.g., the hall outside his cell, the law library, or the visiting room, but not a dorm.  (Defs.' Ex. D, Barnett Decl., ¶ 42.)  At his deposition on September 12, 2012, plaintiff claimed that he was bothered by lights coming through the drawn blinds of the windows behind him, even though the brightness of the light in that room with the lights off and blinds drawn was four times less than that in his cell.  (Defs.' Ex. F, Vandermey Decl., ¶¶ 5(a), 10; Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 52:10-53:2.)

147.  Plaintiff claims that he gets migraines "peripheral light" that comes "off walls and into his eyes from the tops, bottoms, or sides of his dark eyeglasses that "that makes him go "snow blind" and just see "shadows of people," but that direct light does not bother him.  (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 11:4-12:8.)  Dr. Barnett observed plaintiff at his deposition, which was conducted in a room with dark-colored wood-paneled walls, without the lights on, and with the blinds drawn.  Plaintiff was seated with his back to the windows, nevertheless, he claimed that light coming from behind him was bothering him.  (Defs.' Ex. D, Barnett Decl., ¶ 43.)  There is no medical basis for plaintiff's claim that he gets migraines from exposure to peripheral light when wearing dark glasses.  (Id.)

47

148.  Plaintiff is currently prescribed sumitriptan, 50 mg., STAT at onset of migraine, may repeat in 24 hours, maximum nine tablets a month, direct observation therapy (DOT), with six refills.  (Defs.' Ex. D, Barnett Decl.,¶ 44.)  The prescription expires January 25, 2013.  (Id.)  However, medication administration records show that he took the medication only once since May 2012.  (Id. BB 694.)  It is uncertain whether the headaches for which plaintiff takes the medication are migraines because the pain scale is not stated, plaintiff refuses to provide a report of his pain level, or the reported pain (six on a scale of ten) is not indicative of a migraine.  (Id.)

149.  Plaintiff goes to the library and stays about two hours, uses dark tinted glasses to read computer screen that is brighter than his television.  (Pl.'s Dep. of Sept. 12, 2012, RT 101:12-102:25.)  He visits with family in the visiting room, which has multiple exterior windows, overhead fluorescent lights, and brightly painted walls.  (Id. RT 55:4-25.)  The visits last from three to four hours, and he has gotten a headache there.  (Id. RT 55:13-18, 57:7-22.)

150.  Although plaintiff has prescription tinted eyeglasses for distance and reading, he can read without eyeglasses of any kind.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 59:10-15.)

151.  Plaintiff subjective reports of headaches caused by bright light can be managed with dark glasses and medication.  (Defs.' Ex. D, Barnett Decl., ¶ 46.)  He does not have a medical need for cell housing with window tint for this problem, and that precludes him from being housed in a dorm.  (Id.)

**C. Charcot Foot and Peripheral Diabetic Neuropathy**

152.  On September 3, 1997, plaintiff was seen for a complaint of a painful and swollen right ankle due to a sprain suffered the week before when he jumped from a four-foot height.  (Defs.' Ex. D, Barnett Decl., ¶ 47.)  An X-ray of the right ankle showed no fracture.  (Id.)  Motrin and an ACE bandage were ordered.  (Id.)

153.  On September 17, 1997, plaintiff again complained of swelling in his injured foot that was not getting better.  (Defs.' Ex. D, Barnett Decl., ¶ 48.) Plaintiff was given a cane to help with walking and referred to Dr. Kofoed, an orthopedist.  (Id.)

154.  On October 2, 1997, plaintiff complained that his right foot had been swollen for over a month after trauma, but that he thought he might have come down hard on it getting out of

48

his upper bunk.  (Defs.' Ex. D, Barnett Decl., ¶ 49.)  He was noted to be diabetic, with decreased sensation in his foot and ankle, and that his right foot was very swollen and painful.  (Id.) He was offered a lower bunk, but declined it because it made him "claustrophobic."  (Id.)  Motrin and crutches were provided, and he was told to use caution getting out of the upper bunk.  (Id.) Plaintiff then said the injury had occurred at work.  (Id.)  An X-ray done that day showed the possibility of a diabetic Charcot-like joint involving the tarsal navicular that was raised.  (Id.)

155.  Charcot foot can occur in a diabetic who has neuropathy (nerve damage) in the foot that impairs the ability to feel pain and causes progressive degeneration and weakening of bones in the foot).  (Defs.' Ex. D, Barnett Decl., ¶ 50.)  Charcot foot typically occurs following a minor injury, such as a sprain or stress fracture.  (Id.)  Because the patient doesn't feel the injury, he or she continues to walk, making the injury worse. (Id.)  Bones fracture, joints collapse and the foot becomes deformed.  (Id.)

156.  Dr. Kofoed saw plaintiff on October 6, 1997, and diagnosed a fracture of the right navicular and diabetic neuropathy.  (Defs.' Ex. D, Barnett Decl., ¶ 51.)  He ordered a CAT scan of the right foot that showed multifocal small fractures of the tarsal bones with disorganization and extensive soft tissue fullness, secondary to either edema, hemorrhage, or infection.  (Id.)  On October 10, 1997, Dr. Kofoed and another orthopedist agreed that plaintiff should be given a foot brace, and that surgery should be avoided.  (Id.)

157.  On October 22, 1997, Dr. Kofoed found that plaintiff's problem was a complicated one, but that he wanted surgery to fuse the foot fractures, even though he was told there was a risk of infection and subsequent amputation.  (Defs.' Ex. D, Barnett Decl., ¶ 52.)  Dr. Kofoed noted that plaintiff was unwilling to appreciate the risk.  (Id.)  Dr. Kofoed then discussed the option of special bracing to support the foot and maintain alignment to the extent possible.  (Id.)  Plaintiff reported that he was having pain, not experienced with the initial fracture, which Dr. Kofoed noted was a sign of neuropathy, but that neuropathies with associated pain often improve with time as pain decreases.  (Id.)  On November 10, 2012, Dr. Kofoed referred plaintiff to an orthopedist at the University of California-Davis Medical Center (UCDMC) for a second opinion on whether surgery or a foot brace was the best course of management for plaintiff's condition.

1   (Id. ¶ 53.)

2          158.  On December 10, 1997, plaintiff declined an offer of lower-bunk housing, stating

3   that he had no problem climbing to the top of the bunk.  (Defs.' Ex. D, Barnett Decl., ¶ 54.)

4          159.  On December 17, 1997, plaintiff received an orthotic brace for his Charcot foot.

5   (Defs.' Ex. D, Barnett Decl., ¶ 55.)

6          160.  On January 30, 1998, X-rays of plaintiff's right foot and ankle showed a probable

7   Charcot joint with advanced vascular calcification, presumably as the result of severe diabetes

8   mellitus.  (Defs.' Ex. D, Barnett Decl., ¶ 56.)

9          161.  On February 20, 1998, Dr. Kofoed ordered an orthotic foot brace, crutches, and

10  supportive care.  (Defs.' Ex. D, Barnett Decl., ¶ 57.)

11         162.  In April 1998, plaintiff received new molded orthotics because he had complained

12  that the previous one did not fit.  (Defs.' Ex. D, Barnett Decl., ¶ 58.)

13         163.  On May 5, 1998, plaintiff was referred to Dr. Kofoed for a complaint of right foot

14  pain and pedal edema.  (Defs.' Ex. D, Barnett Decl., ¶ 59.)  An X-ray of the right foot showed no

15  change from the January 1998 X-ray.  (Id.)

16         164.  On May 20, 1998, plaintiff asked Prosthetics Clinic staff for a metal brace to be

17  added to his fracture orthotics to take the weight off his ankle and leg when he was walking.

18  (Defs.' Ex. D, Barnett Decl., ¶ 60.)

19         165.  On June 18, 1998, Dr. Quist, a consulting podiatrist, saw plaintiff who said that he

20  wanted surgery.  (Defs.' Ex. D, Barnett Decl., ¶ 61.)  Dr. Quist noted that he told plaintiff he did

21  not do surgeries and that Dr. Kofoed would do the surgery if it was medically indicated.  (Id.)

22  Several days later, Dr. Kofoed saw plaintiff and again told him of the high risks associated with

23  surgery.  (Id. BB 39.)  Plaintiff again did not agree with Dr. Kofoed's medical opinion about the

24  risks associated with surgery.  (Id.)  Dr. Kofoed ordered new X-rays which showed no significant

25  in the alignment of bony structures or new fractures.  (Id.)

26         166.  On July 1, 1998, Senior MTA Donahue prepared a disability verification that

27  plaintiff was permanently mobility-impaired and could not walk 100 yards or up a flight of stairs

28  without pausing with the use of aid (crutches, prosthesis, or walker).  (Defs.' Ex. D, Barnett

1   Decl., ¶ 62.)

2       167.  On July 8, 1998, medical staff adjusted plaintiff's orthotics and noted that he was

3   satisfied.  (Defs.' Ex. D, Barnett Decl., ¶ 63.)  Nine days later, Dr. Kofoed noted that plaintiff was

4   doing much better ordered continued use of the orthotics brace and cane, and a follow-up in three

5   months.  (Id.)

6       168.  On July 24, 1998, a physical therapist evaluated plaintiff for upper extremity range

7   of motion and strength exercises because of his neuropathic right foot.  (Defs.' Ex. D, Barnett

8   Decl., ¶ 64.)  The physical therapist found that plaintiff had normal range of motion and strength

9   in all four extremities, except his right foot secondary to Charcot joint.  (Id.)  The therapist

10  recommended home exercise (push-ups, sit-ups, dips, pull ups) and discharged him, noting that

11  plaintiff wanted to use the Physical Therapy Clinic as a gym, which was not appropriate, and that

12  it was not medically necessary for him to come to the clinic to exercise.  (Id.)

13      169.  On October 8, 1998, X-rays ordered by Dr. Kofoed showed no changes in plaintiff's

14  Charcot joint problem.  (Defs.' Ex. D, Barnett Decl., ¶ 65.)  Dr. Kofoed ordered continued use of

15  the orthotics, which he noted might be necessary for the rest of plaintiff's life.  (Id.)  Plaintiff said

16  he did not want to use the orthotic brace in spite of Dr. Kofoeds' warning that he risked collapse

17  of his foot if he did not.  (Id.)

18      170.  On January 13, 1999, plaintiff was seen by a doctor for a diabetes chronic care

19  intake evaluation.  (Defs.' Ex. D, Barnett Decl., ¶ 66.)  The doctor noted that his glucose control

20  was poor because of his diet, that his compliance with treatment was poor, and that he did not

21  want his blood sugars tightly controlled, even though he was warned about the risk of

22  hypoglycemia (low blood glucose).  (Id.)

23      171.  On March 2, 1999, X-rays showed no change in the status of plaintiff's right

24  neuropathic foot.  (Defs.' Ex. D, Barnett Decl., ¶ 67.)

25      172.  On March 22, 1999, Dr. Kofoed found no progression in plaintiff's right foot

26  neuropathy and ordered continued use of the fracture orthotics and cane, supportive care, and

27  avoidance of surgery.  (Defs.' Ex. D, Barnett Decl., ¶ 68.)

28  /////

173. On May 28, 1999, plaintiff asked to be housed in an upper bunk because a lower bunk made him "claustrophobic." (Defs.' Ex. D, Barnett Decl., ¶ 69.)  A doctor hand-wrote a medical chrono for an upper bunk for "claustrophobia." (Id.)  There was no medical indication for an upper bunk because other doctors had previously recommended a lower bunk because of his Charcot foot and peripheral neuropathy, but plaintiff had refused. (Id.)

174. On August 24, 1999, Dr. Geraghty saw plaintiff, who reported that he could walk without crutches, using only his orthotics and a cane, and that he wanted to go to the "bars" and do chin ups, but that he was not allowed because he could not dismount. (Defs.' Ex. D, Barnett Decl., ¶ 70.)  Dr. Geraghty encouraged plaintiff to walk and do wall push-offs instead. (Id.)  Plaintiff's claim that he could not "dismount" from a chin-up bar was inconsistent with his earlier request for assignment to an upper bunk for "claustrophobia," and is evidence of his use of medical complaints for secondary gain. (Id.)

175. On August 26, 1999, a podiatrist issued a medical chrono allowing plaintiff to wear personal tennis shoes (soft shoes) because of his diabetic neuropathy. (Defs.' Ex. D, Barnett Decl., ¶ 71.)

176. On September 22, 1999, Dr. Geraghty saw plaintiff for diabetic chronic care follow-up and noted that he again claimed to be "claustrophobic" since being imprisoned, and that he was under stress from "group living." (Defs.' Ex. D, Barnett Decl., ¶ 72.)  Plaintiff agreed to try stress reduction techniques. (Id.)  Plaintiff was housed in a lower bunk (P-142L) in the same dorm on Wing P-1, where he would claim in late January 2005 that he could not be housed because of mobility impairment due to Charcot foot and peripheral neuropathy. (Id.)  Dr. Geraghty did not recommend cell housing, or find that plaintiff could not be housed in a dormitory because of his medical problems. (Id.)

177. On November 22, 1999, Dr. Kofoed saw plaintiff for review of his Charcot foot care and a complaint of a flare-up of low-back pain. (Defs.' Ex. D, Barnett Decl., ¶ 73.)  Dr. Kofoed noted that plaintiff had an ankle-foot orthosis (AFO) with rigid hinges and back pain secondary to use of the brace. (Id.)  Dr. Kofoed ordered physical therapy and noted that plaintiff wanted a second brace because he claimed when the brace broke, and he was without it for several weeks

1   while it was being fixed, he could not walk.  (Id.)  Plaintiff had complained of a broken brace on

2   September 29, 1999, which was fixed, attached to new shoes, and delivered on October 27, 1999.

3   (Id.)  A second brace was not ordered.  (Id.)  Plaintiff had the use of crutches and a wheelchair

4   when he was without the orthotic brace.  (Id.)

5         178.  On December 9, 1999, plaintiff complained of back pain on his right side from an

6   injury that occurred while he was "working out."  (Defs.' Ex. D, Barnett Decl., ¶ 74.)  Staff

7   diagnosed a possible muscle strain.  (Id.)

8         179.  On December 27, 1999, plaintiff's orthotic brace was taken by the podiatrist for

9   repair.  (Defs.' Ex. D, Barnett Decl., ¶ 75.)  Plaintiff later told the podiatrist that he needed a

10   second brace and shoe, and falsely claimed that Dr. Kofoed had ordered one, but the podiatrist

11   noted that he could not find such an order.  (Id.)

12         180.  On February 28, 2000, the podiatrist adjusted plaintiff's brace.  (Defs.' Ex. D,

13   Barnett Decl., ¶ 76.)

14         181.  Plaintiff was moved to a cell (P-134L) on Wing P-1 on December 18, 2000.  (Defs.'

15   Ex. E, Weaver Decl., ¶ 77.)

16         182.  On April 26, 2001, Dr. Crapotta, a consulting ophthalmologist, saw plaintiff and

17   recommended a medical chrono for cell-based housing, in part because  plaintiff had chronic

18   arthritis which caused difficulty ambulating.  (Defs.' Ex. B, Barrett Decl., ¶ 78.)  The

19   orthopedist and podiatrist, who were most knowledgeable about  plaintiff's mobility impairment

20   due to Charcot foot and peripheral neuropathy, had not found that a medical chrono for cell

21   housing was needed.  (Id.)  Plaintiff's medical record does not show that he was unable to

22   ambulate safely in a dorm with the assistance of his cane, crutches, or wheelchair.  (Id.)

23         183.  On June 14, 2001, Dr. Sawicki, a consulting podiatrist, recommended a medical

24   chrono, approved by Dr. Andreasen, for a soft leather shoe to use when the special shoe

25   incorporated with  plaintiff's orthotic brace broke down, and the brace was being repaired.

26   (Defs.' Ex. B, Barrett Decl., ¶ 79.)

27         184.  On July 2, 2001, Dr. Altchek wrote a medical chrono, approved by Dr. Andreasen,

28   stating that the only job plaintiff could do was a clerk's job in a setting where he did not have to

do much walking because he could not walk very long and could not lift because of a right Charcot joint, which swelled if he stood longer than ten minutes, and which required elevation and an orthotic brace for his lower right leg, and a cane or crutches for walking.  (Defs.' Ex. B, Barrett Decl., ¶ 80.)

185.  On October 3, 2001, Dr. Aguilera saw plaintiff in the Diabetic Clinic, noted that his diabetes was in good control, and that he wore a "full-control brace and orthopedic shoes, ambulated with a cane, and was managing "quite well" with those aids.  (Defs.' Ex. B, Barrett Decl., ¶ 81.)

186.  On November 29, 2001, Dr. Andreasen approved a one-year medical chrono that recommended continued cell housing for, among other problems, the inability to safely navigate in a dorm environment due to chronic degenerative knee changes associated with diabetes. (Defs.' Ex. B, Barrett Decl., ¶ 82.)  Plaintiff did not have a medical need based on mobility impairment for cell housing.  (Id.)  Plaintiff walked from his housing unit to the medical clinic and dining hall and back several times each day using his brace and cane.  (Id.)

187.  On March 18, 2002, plaintiff complained pain, bruising, and swelling in his right foot that happened when he slipped and fell from a toilet on which he was standing while cleaning a wall in his cell.  (Defs.' Ex. B, Barrett Decl., ¶ 83.)  X-rays showed a non-displaced, oblique fracture of the first proximal phalanx of the great toe of the right foot. (Id.)  Plaintiff was noted to already be taking anti-inflammatory medication, and no further treatment was ordered. (Id.)

188.  On May 2, 2002, Dr. Sawicki saw plaintiff in the Podiatry Clinic and noted that X-rays showed no significant healing in his fractured toe.  (Defs.' Ex. B, Barrett Decl., ¶ 84.)  Dr. Sawicki ordered repairs on plaintiff's orthotic brace and new X-rays and a follow-up in six weeks to evaluate whether the fracture was healing.  Repeat X-rays done on June 17, 2002, showed a subacute fracture of the first proximal phalanx with subtle healing since the previous X-ray.  (Id.)

189.  On August 20, 2002, Dr. Altchek recommended, and Dr. Bick approved, renewal of plaintiff's medical chrono for cell-based housing, in part, because of inability to safely navigate in dorm environment because of chronic degenerative knee changes associates with diabetes.

1  (Defs.' Ex. B, Barrett Decl., ¶ 85.)  There is no medical basis for that medical chrono, which was

2  renewed based on the earlier one, rather than because of a medical need.  (Id.)

3       190.  Plaintiff was moved to a cell (I-137L) in I Wing on February 15, 2003.  (Defs.' Ex.

4  E, Weaver Decl., ¶ 13.)

5       191.  Ten days later, Dr. Ho recommended a medical chrono for use of a wheelchair to aid

6  in walking because plaintiff's foot swelled when he stood for more than ten minutes.  (Defs.' Ex.

7  B, Barrett Decl., ¶ 87.)  Dr. Bick approved that chrono.  (Id.)

8       192.  On August 3, 2003, Dr. Shellcroft recommended a medical chrono, in part, for

9  plaintiff's:  (1) right Charcot foot, which caused a limited ability to stand, and for which he

10  needed an orthotic right-leg brace and a cane for walking; and for (2) peripheral neuropathy,

11  which required lower bunk/low tier housing, or an elevator pass, if he was house on an upper

12  floor; or (3) transfer to another institution if that housing could not be provided at CMF.  (Defs.'

13  Ex. B, Barrett Decl., ¶ 88.)  The chrono did not recommend cell housing, as had a previous

14  chrono that had expired.  (Id.)  Dr. Bick approved that chrono.  (Id.)

15       193.  On August 5, 2003, Dr. Capozzoli saw plaintiff for a neurology consultation and

16  the EMG and /nerve conduction studies for right ankle, hand, and finger pain secondary to

17  diabetic neuropathy.  (Defs.' Ex. B, Barrett Decl., ¶ 89.)  The examination and tests showed

18  obvious peripheral neuropathy consistent with severe sensorimotor polyneuropathy.  (Id.)  Dr.

19  Capozzoli did not recommend cell housing for the peripheral neuropathy.  (Id.)

20       194.  On August 28, 2003, plaintiff told Dr. Aguilera that he needed a medical chrono for

21  cell-based housing renewed and that he used his leg brace to ambulate in the cell.  (Defs.' Ex. B,

22  Barrett Decl., ¶ 90.)  Dr. Aguilera did not recommend a medical chrono for cell-based housing.

23  (Id.)

24       195.  On January 30, 2004, plaintiff filed a grievance (Log No. CMF-04-M-192) asking

25  that he be given a medical chrono for cell housing and that custody staff be prohibited from

26  moving him to a dormitory.  (Defs.' Ex. B, Barrett Decl., ¶ 91.)  Plaintiff was in a cell at the time.

27  (Id.)  Plaintiff complained that he had expired chronos for cell housing, and that Dr. Bick had not

28  renewed the cell-housing recommendation in 2003.  (Id.)  In part, plaintiff claimed that if he was

moved to a dormitory he could not safely "navigate" because of degenerative knee problems secondary to his diabetes. (<u>Id.</u>) Review at the informal and formal levels was bypassed. (<u>Id.</u>) Senior MTA Donahue interviewed plaintiff at the second level and recommended that the grievance be denied. (<u>Id.</u>) Dr. Bick, the Chief Medical Officer, approved the denial on March 15, 2004, in part, because plaintiff's ambulatory impairment did not require cell housing for medical reasons. (<u>Id.</u>) Plaintiff appealed to the second level where the grievance was reviewed by Dr. Andreasen, the Chief Medical Officer for Inpatient Services, on behalf of Warden Schwartz, and denied by Dr. Khoury, Chief Deputy for Clinical Services, on April 15, 2004. (<u>Id.</u>) At that level, plaintiff claimed that he needed handrails installed in the dorm to allow him to walk safely. (<u>Id.</u>) Plaintiff had the use of ambulatory aids, such as his cane or wheelchair, in the living area of the dorm, and he had no medical need for handrails to assist him in moving about the dorm. (<u>Id.</u>) Plaintiff appealed to the third level on June 7, 2004, but the grievance was rejected at the Director's level by Chief of Inmate Appeals Grannis on July 16, 2004, because it was not timely. (<u>Id.</u>)

196. On February 27, 2004, Dr. Highsmith, a consulting podiatrist recommended a medical chrono that allowed plaintiff the use of forearm crutches for severe peripheral polyneuropathy and for Charcot neuroarthropathy of the right foot. (Defs.' Ex. B, Barrett Decl., ¶ 92.) Plaintiff was to provide his own crutches and have them added to his list of approved personal property. (<u>Id.</u>) Plaintiff had been provided a State-issued cane and regular crutches in the past, in addition to his orthotic brace. Dr. Bick approved that chrono, as well as one for a wheelchair a month later. <u>Id.</u>)

197. On August 27, 2004, Dr. McAllister recommended, and Dr. Bick approved, medical chronos for an orthotic brace for plaintiff's right leg, a cane for walking, low bunk/lower tier housing, an elevator pass, and transfer to another institution if a lower bunk was not available at CMF. (Defs.' Ex. B, Barrett Decl., ¶ 93.) Cell-based housing was not recommended for a mobility impairment. (<u>Id.</u>)

198. Plaintiff was moved to a dorm bed (J-353L) in Wing J-3 on December 17, 2004. (Defs.' Ex. E, Weaver Decl., ¶ 15.) The dorm was a regular dorm, not a converted dayroom, that

1   housed twelve inmates in double bunks.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 62:21-

2   63:12.)  Plaintiff's bed was on the other side of a wall where the bathroom was.  Id. RT 65:23.)

3   To get to the bathroom, plaintiff had to walk about fifteen feet around his bed and prisoner

4   lockers to get to the bathroom.  (Id. RT 66:1-10.).

5        199.   Plaintiff had his cane in the dorm, but did not go farther than the restroom because

6   there were only a few Caucasian prisoners like himself, in the dorm; most of the inmates were

7   Northern Hispanics or Black, so he did not socialize much.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12,

8   2012, RT 68:2-8.)  Plaintiff would stay on his bed and "tent himself" by putting up sheets from

9   the upper bunk to block getting to the lower bed, because it was painful to move about.  (Id.)

10        200.  On January 11, 2005, plaintiff complained that he had "ADA" difficulties in his

11   "new house" but they are not detailed in his medical record.  (Defs.' Ex. B, Barrett Decl., ¶ 95.)

12        201.  On January 27, 2005, plaintiff was moved to a bed (P-139L) in a dorm on Wing P-

13   1.  (Defs.' Ex. E, Weaver Decl., ¶ 17.)

14        202.  On February 4, 2005, Dr. McAllister recommended, and Dr. Bick approved, a

15   medical chrono for plaintiff's use of crutches and a wheelchair for severe peripheral neuropathy

16   and Charcot neuropathy of the right foot.  (Defs.' Ex. B, Barrett Decl., ¶ 97.)  Cell-based housing

17   was not found to be medically necessary for those problems.  (Id.)

18        203.  On May 16, 2005, Dr. Capozzoli recommended cell housing for plaintiff in part

19   because he was "wheelchair dependent" due to peripheral neuropathy, and dorm housing was

20   "less conducive" to accommodating that medical need and others discussed elsewhere in this

21   declaration.  (Defs.' Ex. B, Barrett Decl., ¶ 98.)  There is no medical basis for this chrono.  (Id.)

22   Plaintiff was not "wheelchair dependent," but rather was able to ambulate using an orthotic

23   brace and cane or crutches.  (Id.)  He only used a wheelchair for traveling long distances, or when

24   required to be on his feet for a long time.  (Id.)  There is no medical reason he could not travel the

25   short distances that it took to get from his bed in the dorm to a restroom, or around the dorm, with

26   the assistance of his orthotic brace and cane.  (Id.)  Dr. Bick correctly changed Dr. Capozzoli's

27   "recommendation" to a "request" for cell housing that gave custody staff discretion to assign

28   plaintiff to either a cell or a dorm based on Custody and institutional safety requirements.  (Id.)

1    204.  On March 20, 2007, plaintiff was moved to a cell, and has been in a cell since that

2    time.  (Defs.' Ex. E, Weaver Decl., ¶¶ 18-19.)

3    205.  On August 8, 2005, Dr. Calvo wrote a medical chrono, noting that plaintiff had a

4    limited ability to stand and that he required an orthotic brace for his right leg and a cane for

5    walking.  (Defs.' Ex. B, Barrett Decl., ¶ 99.)  Dr. Calvo recommended that plaintiff be assigned

6    lower bunk/lower tier housing and an elevator pass, and that he be transferred to another facility if

7    that housing could not be provided at CMF.  (Id.)  Dr. Bick approved that recommendation.  (Id.)

8    That medical chrono did not recommend cell housing for a mobility impairment.  (Id.)

9    206.  On August 18, 2005, plaintiff submitted an inmate grievance (Log No. CMF-05-M-

10   1431) appealing the denial of his accommodation for cell housing because of his Charcot foot and

11   peripheral neuropathy.  (Defs.' Ex. B, Barrett Decl., ¶ 100.)  Plaintiff claimed that he needed cell

12   housing because a wheelchair could not fit through the dorm door because it was not 42-inches

13   wide as required by the ADA, that he could not operate a wheelchair between the beds in the

14   twelve-man dorm, and that he could not walk in the dorm without the risk of tripping and injuring

15   himself because of numbness in his feet due to neuropathy.  (Id.)  That grievance was denied at

16   the second level of review on September 21, 2005, by Warden Schwartz and Dr. Khoury.  (Id.)

17   The response found that plaintiff had been moved to dorm housing on December 17, 2004,

18   because an inmate with higher custody levels (Close B) had to be moved to his cell because it

19   provided more restrictive housing.  (Id.)  Housing assignment records indicate that the inmate

20   who was moved into plaintiff's bed in I Wing in December 2004 was a close custody inmate.

21   (Id.)  Plaintiff was a Medium A Custody level inmate so he could be housed at a lower level of

22   supervision, such as in a dorm.  (Id.)  The response found that the Armstrong remedial plan

23   allowed him to be celled in the dorm because security needs outweighed the medical

24   recommendation.  (Id.)  The response further found that plaintiff was housed in a dorm bed on

25   P-wing that was two or three feet from the door of the restroom, which accommodated one user at

26   a time, and that he did not require full-time use of a wheelchair, but only when outside a cell.

27   (Id.)  When he was in the dorms, plaintiff had his wheelchair which he folded up and kept in a

28   corner, but he did not use it to get to the bathroom because he did not want the hassle of having to

1    pull it out and unfold it, and it would not fit through the bathroom door.  (Defs.' Ex. A, Pl.'s Dep.,

2    June 12, 2007, RT 29:10-19.)  Plaintiff appealed to the Director's level, claiming that he had to

3    walk a "U-shaped" path with two ninety-degree turns, where he might lose his balance, getting to

4    the toilet.  (Defs.' Ex. D, Barrett Decl., ¶ 100.)  Plaintiff never fell when he was in the dorms.

5    (Defs.' Ex. A, Pl.'s Dep., June 12, 2007, RT 27:22-2828:3; Defs.' Ex. B, Pl.'s Dep. of Sept. 12,

6    2012, RT 95:25-96:8.)  Plaintiff appealed to the Director's level, where the grievance was denied

7    by Chief of Appeals Grannis on December 23, 2005.  (Defs.' Ex. D, Barrett Decl., ¶ 100.)

8         207.  On October 25, 2005, plaintiff saw Dr. Calvo for renewal of his medications and

9    medical chrono.  (Defs.' Ex. B, Barrett Decl., ¶ 101.)  Dr. Calvo noted that plaintiff was

10   categorized as DPO (intermittent wheelchair user), not DPW (permanent wheelchair user), and

11   that a medical chrono and a Disability Placement Program Verification (CDCR 1845) stating that

12   he was an intermittent wheelchair user who needed a lower bunk had been done and approved by

13   Dr. Andreasen.  (Id.)

14        208.  Plaintiff was moved to a bed (H-342L) in Dorm 2 in Wing H-3 on December 13,

15   2005.  (Defs.' Ex. E, Weaver Decl., ¶17.)  The bathroom in that dorm was 20 to 25 feet from his

16   bed.  (Defs.' Ex. B, Pl.'s Dep. of Sept. 12, 2012, RT 79:22-24.)  Plaintiff had both a cane and

17   crutches in the dorms, but mainly used his crutches to get to the bathroom.  (Id. RT 80:4-12.)

18        209.  Plaintiff was moved to a cell on March 20, 2007, to comply with a preliminary

19   injunction order.

20        210.  Plaintiff walked to his September 12, 2012 deposition from his cell in Wing V-1had

21   using a cane.  (Defs.' Ex. D, Barnett Decl., ¶ 103.)  He did not wear his orthotic brace and

22   ambulated well with only the aid of his cane.  (Id.)  Plaintiff does not use the orthotic brace and

23   can walk three times a day from his cell to the medical clinic and back, a distance of a couple of

24   hundred yards one way, wearing his tennis shoes and using only a cane.  (Defs.' Ex. B, Pl.'s Dep.

25   of Sept. 12, 2012, RT 40:12-41:7.)  Plaintiff did not have a medical need for cell housing because

26   of his Charcot foot and peripheral neuropathy in from December 17, 2004 to March 20, 2007,

27   when he was housed in dorms, and he has no need for cell housing for those reasons at present.

28   (Id.)

**D. Unpredictable Bowel and Bladder Urgency.**

211.  Plaintiff claims that he could not be housed in a dorm because of unpredictable bowel and bladder problems associated with his diabetes.  (Defs. Ex. D, Barnett Decl., ¶ 104.)  He claims that he had to wait anywhere from one minute to two hours to use the toilet depending on the time of day and what the inmate ahead of him was doing in the restroom.  (Id.)  Plaintiff also claims he had pain that was ten on a scale of 10 three times a day trying to control himself.  (Id.)  It is not medically possible to have pain at that level and still have muscle control of urinary or bowel functions.  (Id.)  Plaintiff never complained to officers about having to wait to use the bathroom, and he never had diarrhea while waiting.  (Id.)  There is nothing in plaintiff's medical history that would require cell housing for bowel and bladder urgency, or that would preclude dorm housing.  (Id.)

212.  The first time plaintiff complained that he could not be housed in a dorm because of bowel and bladder urgency was on February 25, 2000, when he complained that he required cell housing because he needed to use the toilet frequently because of polyuria and occasional diarrhea.  (Defs. Ex. D, Barnett Decl., ¶ 105.) Plaintiff's medical records do not show such a complaint in the previous thirteen years of his incarceration.  Plaintiff's claim that he needed cell housing for this reason coincides with his objections to being assigned to a dorm.  (Id.)

213.  Polyuria is the excessive passage of urine (at least 2.5 liters per day for an adult) resulting in profuse urination and urinary frequency (the need to urinate frequently).  (Defs. Ex. D, Barnett Decl., ¶ 106.)  Polyuria occurs when diabetes is not in good control which was often the case with plaintiff. (Id.) When plaintiff complied with his treatment regimen and had good control of his diabetes, he did not have polyuria. (Id.)

214.  On May 18, 2000, Dr. Geraghty saw plaintiff and noted that his housing was unchanged and that he had "expected GI enteropathy with urgency, and that he was using crutches because his brace was out for repairs.  (Defs. Ex. D, Barnett Decl., ¶ 107.)  Intestinal enteropathy can occur in diabetics and cause diarrhea, constipation, or fecal incontinence.  (Id.) Plaintiff's medical record contains nothing to show that he had fecal incontinence, and his complaints of either diarrhea or constipation, which would not require immediate access to a

1   toilet, are sporadic at best, and there is no order for medications for those problems.  (<u>Id.</u>)

2   Plaintiff's claim that he had muscle control over those functions is not consistent with intestinal

3   enteropathy.  (<u>Id.</u>)  For those reasons, Dr. Geraghty's diagnosis based on "expectations" is not

4   founded in fact.  (<u>Id.</u>)  In any event, Dr. Geraghty did not recommend a medical chrono for cell

5   housing for that reason at that time. (<u>Id.</u>)

6         215.  On March 14, 2001, plaintiff was seen for follow-up in the Diabetic Clinic and this

7   time denied polyuria and polydipsia (excessive thirst).  (Defs. Ex. D, Barnett Decl., ¶ 108.)

8         216.  On August 20, 2002, Dr. Altchek recommended a medical chrono for cell-based

9   housing, in part, because of plaintiff's frequent and unpredictable bowel and urinary changes.

10  (Defs. Ex. D, Barnett Decl., ¶ 109.)  Dr. Bick approved the recommendation.  (<u>Id.</u>)  That chrono

11  expired August 19, 2003, and was not renewed.  (<u>Id.</u>)  Plaintiff's medical record does not show a

12  medical need for such a chrono.  (<u>Id.</u>)

13        217.  On August 28, 2003, plaintiff told Dr. Aguilera that he needed his medical chrono

14  for cell-based housing renewed because he used an orthotic brace to ambulate.  (Defs. Ex. D,

15  Barnett Decl., ¶ 110.)  Dr. Aguilera noted that plaintiff did not mention that as a reason he needed

16  cell housing this time, even though it was contained in a previous medical chrono.  (<u>Id.</u>)

17        218.  On October 31, 2003, plaintiff told Dr. Steve that he alternated between

18  constipation and bloating when his blood sugars were low, and loose bowel movements, when

19  they were high.  (Defs. Ex. D, Barnett Decl., ¶ 111.)  Dr. Steve noted that "it might be a bit of a

20  stretch," but that he "might be developing enteric neuropathy."  (<u>Id.</u>)  The doctor decided to try

21  plaintiff on metcloplamide, 5 mg., three times, for 90 days.  (<u>Id.</u>)  That medication is used in

22  diabetics to treat slow stomach emptying by helping speed the movement of food through the

23  stomach and intestines, and to relieve its symptoms, which include nausea, vomiting, heartburn,

24  loss of appetite, and the feeling of fullness that lasts long after meals.  (<u>Id.</u>)  The medication was

25  not renewed when it expired, and plaintiff was not on medication for bladder or bowel problems

26  when he was later moved to the dorms.  (<u>Id.</u>)  Plaintiff did not have enteric enteropathy as Dr.

27  Steve speculated, and he has not been diagnosed with it since.  (<u>Id.</u>)

28  /////

61

1    219.  On January 30, 2004, plaintiff filed a grievance (Log No. CMF-04-M-192) which,

2    in part, stated that he should not be housed in a dorm because he had "frequent and

3    unpredictable" bowel movements requiring access to the bathroom.  (Defs. Ex. D, Barnett Decl.,

4    ¶ 112.)  Senior MTA Donahue interviewed plaintiff concerning his inmate grievance at the

5    second level of review and recommended that it be denied.  (Id.)  Dr. Bick, the Chief Medical

6    Officer, approved the denial on March 15, 2004, in part his claimed frequent bowel and urinary

7    needs could be accommodated in a dormitory with multiple toilets.  (Id.)  Plaintiff appealed to the

8    second level of review where he complained that there were no dorms in Unit I that had multiple

9    toilets.  (Id.)  Dr. Andreasen reviewed the grievance, which was denied by Dr. Khoury, who

10   found that there were dorms in Unit I with more than one toilet.  (Id.)  Plaintiff appealed to the

11   third level of review on June 7, 2004, complaining that he could not be housed in those dorms for

12   other reasons.  (Id.)  The grievance was rejected at the Director's level by Chief of Inmate

13   Appeals Grannis on July 16, 2004, because it was not timely.

14   220.  On May 16, 2005, Dr. Capozzoli recommended cell housing, in part, based on the

15   statement that plaintiff had autonomic neuropathy that affected his bowel and bladder control.

16   (Defs.' Ex. D, Barnett Decl., ¶ 113.)  Dr. Capozzoli's progress note contains no facts to support

17   the statement in the medical chrono that plaintiff had autonomic neuropathy, which is a group of

18   symptoms that occur when there is damage to the nerves that manage every day body functions

19   such as blood pressure, heart rate, sweating, bowel and bladder emptying, and digestion.  (Id.)

20   Diabetic neuropathy is one of the causes of autonomic neuropathy, and plaintiff had reported

21   some symptoms, such as occasional constipation and alternatively soft stools, which can also be

22   from other causes, including the medications he was taking.  (Id.)  Plaintiff's had muscle control

23   of his bowels and bladder and was not incontinent when he was in the dorms.  (Defs.' Ex. B, Pl.'s

24   Dep. of Sept. 12, 2012, RT 92:2-14.)  That is not consistent with autonomic neuropathy, or a

25   medical need for cell housing because of an inability to control bowel and bladder functions.

26   (Defs.' Ex. D, Barnett Decl., ¶ 113.)  State law provides criteria that directs the delivery of

27   medical services to be consistent with best practices, and requires that medical services are

28   necessary and support by outcome data.  (Id.)  Furthermore, "medically necessary" is defined by

1    state law as services needed to protect life, prevent significant illness or disability, or to alleviate

2    severe pain, as set forth in Title 15, section 3350(b)(1) of the California Code of Regulations.

3    (Id.)  The medical record does not provide any evidence that plaintiff faced risks to his life or

4    significant illness or disability that required a cell for the purported autonomic dysfunction or any

5    other condition. (Id.)

6        221.  On July 11, 2006, Nurse Practitioner Champen and Dr. Bick approved medical

7    chrono for extra toilet paper each week because of plaintiff's bowel and bladder control problems.

8    (Defs.' Ex. D, Barnett Decl., ¶ 114.)  The medical support for that chrono is not stated, and cell

9    housing was not recommended. (Id.)

10       222.  Plaintiff's current medical chrono only provides that he may need additional toilet

11    paper for a medical condition affecting his bowel or bladder control, but that condition is not

12    documented with facts in the corresponding progress notes.  (Defs.' Ex. D, Barnett Decl., ¶ 115.)

13    Cell housing for that problem is not recommended, and it would not preclude his housing in a

14    dorm.

15    **E. Current Medical Chronos**

16       223. Plaintiff has three current medical chronos, written by Dr. Mathis and approved by

17    Dr. Bick, which are effective for one year from the date of issuance.  (Defs.' Ex. D, Barnett Decl.,

18    ¶116.)  None of them require that he be housed in a cell, and none preclude his assignment to a

19    dorm. (Id.)

20       224.  A February 13, 2012, chrono advised custody staff that he "requires" an orthotic

21    brace for his right leg and a single-point cane for walking, lower bunk/lower tier housing, and an

22    elevator pass for Charcot foot.  (Defs.' Ex. D, Barnett Decl., ¶ 117.)  The chrono also allows

23    plaintiff to use crutches and a wheelchair, as necessary, when he is required to stand for

24    prolonged periods of time to minimize swelling and chronic pain in his right foot.  (Id.)  The

25    chrono also recommends that he avoid significant changes in his daily activity levels because his

26    balance is affected by peripheral neuropathy when standing.  (Id.)  The chrono also provides for

27    use of approved dark glasses and window tinting "subject to legitimate institutional safety and

28    security concerns" for diabetic retinopathy and photophobia.  (Id.)  It does not require cell

housing.  (Id.)  Plaintiff does not require cell housing with window tinting because he does not have photophobia caused by a vision problem or ocular pathology.  (Id.)  The chrono also provides for that he "may require additional toilet paper" because of a "medical condition" that affects his bowel and bladder control.

225.  A May 25, 2012 chrono states that he has a "medical condition" that causes pain when he is exposed to bright light and asks custody staff to "not put him in situations in which he will be unnecessarily subjected to bright light for prolonged periods of time."  (Defs.' Ex. D, Barnett Decl., ¶ 118.)  Plaintiff does not have photophobia that requires him to avoid brightly lit areas when using dark glasses, that requires cell housing with window tint, or that precludes him from being housed in a dorm.  (Id.)

226.  On July 26, 2012, plaintiff told his treating doctor that he had a court order for "tinted window housing."  (Defs.' Ex. D, Barnett Decl., ¶ 119.)

227.  An August 9, 2012 chrono simply continues a prior chrono for the use of personal soft shoes, rather than State-issued shoes because of the loss of sensation and edema due to peripheral neuropathy and associated loss of function in his lower extremities and degenerative joint disease in his foot.  (Defs.' Ex. D, Barnett Decl., ¶ 120.)

228.  Plaintiff does not have medical needs that require him to be housed in a cell with window tinting and that preclude his housing in a dorm.  (Defs.' Ex. D, Barnett Decl., ¶ 121.) He has been assigned to cells since March 20, 2007, but custody staff have the discretion to house him in either a cell or dorm based on safety and security or institutional needs.  (Id.)

229. D r. Bick's medical care decisions were appropriate, compassionate, and not deliberately indifferent to plaintiff's medical conditions.  (Defs.' Ex. D, Barnett Decl., ¶ 122.) In accordance with community standards of care and principles of ethical medical practice, Dr. Bick and other physicians providing care to inmates at CMF are obliged to independently assess the clinical condition of patients under their care.  (Id.)  Dr. Bick and other physicians caring for plaintiff have a duty to make diagnoses and provide treatment with consistent to the findings in the examinations that reasonably serve patients' evident medical needs.  (Id.)  Section 33350(a) of Title 15 of the California Code of Regulations codifies this duty and allows that, inmates are

1   provided only such medical services that are "based on medical necessity and supported by

2   outcome data as effective medical care."  (Id.)

3        230.  In this case, Dr. Bick reasonably determined that some accommodations sought by

4   plaintiff, whether or not also recommended by other physicians, were not medically necessary.

5   (Defs.' Ex. D, Barnett Decl., ¶ 123.)  Dr. Bick acted in good faith after consideration of the

6   evidence he had, and provided care that comports with best practices for the community, as well

7   as care that complies with state law.  (Id.)  Dr. Bick performed his duty to critically evaluate

8   requests by plaintiff, and to assess the accuracy or necessity of recommendations from other

9   sources as well, including the recommendations of other health care providers.  (Id.)  This

10  deliberation defines engagement, and is the opposite of indifference.

11       231.  Dr. Bick reasonably considered the total picture of  plaintiff's clinical history

12  and examination.  (Defs.' Ex. D, Barnett Decl., ¶ 124.)  Plaintiff's requests appeared to be

13  based upon non-medical considerations, and often he complained of symptoms without any basis

14  in fact.  (Id.)  Furthermore, some of the recommendations made by specialists were appropriately

15  not followed when these recommendations did not appear to take into account the total clinical

16  circumstances.  (Id.)  The decisions made by Dr. Bick and other defendants were reasonable and

17  appropriate, and most definitely not arrived at indifferently, or without due regard for the

18  patient's medical needs.  (Id.)

19                                        **ANALYSIS**

20       The gravamen of plaintiff's complaint is that the defendants ignored his treating

21  physicians' recommendations to house plaintiff in a cell with tinted windows rather than a

22  dormitory to meet his serious medical needs.  (Pl.'s Mot. for Summ. J. at 1.)  In resolving cross-

23  motions for summary judgment, the court must consider each party's evidence.  See Johnson v.

24  Poway Unified School District, 658 F.3d 954, 960 (9th Cir. 2011).  Because plaintiff will bear the

25  burden of proof at trial, in order to prevail on summary judgment he must affirmatively

26  demonstrate that based upon the undisputed facts no reasonable trier of fact could find other than

27  for him.  See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Because

28  defendants do not bear the burden of proof at trial, in moving for summary judgment they need

1   only prove an absence of evidence to support plaintiff's case.  See Oracle Corp., 627 F.3d at 387.

2   Below, the court will address the merits of the parties' cross-motions for summary

3   judgment on plaintiff's Eighth Amendment and ADA claims.  The court will also address

4   defendants' arguments that plaintiff's request for injunctive relief lacks merit and that they are

5   entitled to qualified immunity.  Based on all of the evidence presented in connection with the

6   pending cross-motions for summary judgment, and for the reasons stated below, the undersigned

7   finds that plaintiff's motion for summary judgment should be denied.  The undersigned further

8   concludes that defendants' motion for summary judgment should be granted in part and denied in

9   part.

10  I. Plaintiff's Eighth Amendment Claims

11  First, the court will address the parties' cross- motions for summary judgment with respect

12  to plaintiff's Eighth Amendment claims.  As to plaintiff's motion for summary judgment, the

13  court finds that plaintiff has failed to meet his initial burden of demonstrating on summary

14  judgment that the defendants were deliberately indifferent to his serious medical needs[2] in

15  violation of the Eighth Amendment.  To be sure, the undisputed facts in this case show that some

16  of plaintiff's treating physicians, including Dr. Crapotta, an ophthalmologist, and Dr. Capozzoli, a

17  neurologist, recommended cell housing for plaintiff while prison officials, particularly defendant

18  Bick, disagreed, believing instead that a dormitory assignment could meet plaintiff's medical

19

---

[2]  The parties do not seriously dispute, and the court finds that, based upon the evidence presented
by the parties in connection with the pending cross-motions for summary judgment, a reasonable
juror could conclude that plaintiff's various medical conditions, including his diabetic
retinopathy, photophobia, migraine headaches, mobility challenges, and autonomic neuropathy
constitute objective, serious medical needs.  See McGuckin, 974 F.2d at 1059-60 ("The existence
of an injury that a reasonable doctor or patient would find important and worthy of comment or
treatment; the presence of a medical condition that significantly affects an individual's daily
activities; or the existence of chronic and substantial pain are examples of indications that a
prisoner has a 'serious' need for medical treatment."); see also Canell v. Bradshaw, 840 F. Supp.
1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to
medical conditions that may result in pain and suffering which serve no legitimate penological
purpose.").  Specifically, plaintiff's well-documented medical history, as well as the observations
and treatment recommendations by plaintiff's treating physicians and prison officials compel the
conclusion that plaintiff's medical conditions, if left untreated, could result in "further significant
injury" and the "unnecessary and wanton infliction of pain."  McGuckin, 974 F.2d at 1059.

1   needs and rejected or modified his physicians' recommendations based on that belief.[3]

2          However, as defense counsel argues, a mere difference of opinion between doctors does

3   not give rise to liability on a § 1983 claim.  See Snow, 681 F.3d 987; see also Toguchi, 391 F.3d

4   at 1059-60 ("Dr. Tackett's contrary view was a difference of medical opinion, which cannot

5   support a claim of deliberate indifference."); Sanchez, 891 F.2d at 242 (difference of opinion

6   between medical personnel regarding the need for surgery does not amount to deliberate

7   indifference to a prisoner's serious medical needs).  To establish that a difference of medical

8   opinion as to the appropriate course of treatment amounted to deliberate indifference, the

9   evidence must "show that the course of treatment the doctors chose was medically unacceptable

10  under the circumstances" and that "they chose this course in conscious disregard of an excessive

11  risk to [the prisoner's] health."  Jackson, 90 F.3d at 332.

12         Here, plaintiff has not come forward with evidence establishing that defendants' course of

13  treatment was medically unacceptable or that defendants acted in conscious disregard to a

14  substantial risk of injury or harm to plaintiff's health.  At most, plaintiff points to his treating

15  physicians' medical chronos, recommending cell housing for him, and seems to believe that the

16  chronos are sufficient to prove defendants acted with deliberate indifference by not strictly

17  adhering to them.  However, these medical chronos demonstrate that cell housing was a medically

18

19  [3] For example, on March 9, 2004, Dr. Crapotta issued a medical chrono stating:  "Mr. Stringham
    has proliferative diabetic retinopathy and photophobia.  He should wear dark glasses and have
20  window tint as consistent with California Medical Facility regulations.  This should remain in
    effect for one year through March 8, 2005."  Defendant Bick lined through the portion of the
21  chrono that stated plaintiff should have window tint as consistent with California Medical Facility
    regulations and wrote instead "only CMF approved dark glasses."  (Defs.' Ex. C, Hinman-
22  Seabrooks Decl., HS229).  Similarly, on May 16, 2005, Dr. Capozzoli issued a medical chrono
    for plaintiff stating:  "I would recommend that Mr. Stringham be provided with cell housing
23  (single cell housing not required).  Mr. Stringham has diabetes with severe neuropathy involving
    also autonomic neuropathy affecting his bowel and bladder control.  Additionally, he has diabetic
24  retinopathy and vascular headaches with photophobia . . . .  For all of the above reasons, I
    recommend that he be allowed to live in a cell rather than a dorm environment, which is less
25  conducive to accommodating his above-mentioned medical needs.  This chrono is valid for one
    year (through May 15, 2006), subject to annual renewal and to custody and institutional safety
26  requirements."  Defendant Bick again lined through the portion of the chrono that stated
    "recommend" and changed it to "request" and underscored that the chrono was subject to custody
27  and institutional safety requirements.  (Defs.' Ex. C, Hinman-Seabrooks Decl., HS234.)

28

1    acceptable course of treatment for plaintiff.  They do not demonstrate beyond reasonable dispute

2    that dormitory housing, coupled with dark glasses and draping, was not medically acceptable as

3    well.  See Farmer, 511 U.S. at 844-45 (even where a prison official knows of a substantial risk to

4    an inmate's health but responds reasonably to the risk, he or she cannot be found liable under the

5    Cruel and Unusual Punishment Clause, even if harm is ultimately not averted); Histon v. Tilton,

6    No. C 09-0979 JSW (PR), 2012 WL 476388 at *6 (N.D. Cal. Feb. 14, 2012) (although two

7    orthopedic surgeons recommended surgery for plaintiff's carpal tunnel syndrome, their

8    recommendations did not demonstrate that the defendant's alternate approach was medically

9    unacceptable).

10          Moreover, even if plaintiff had met his initial burden of demonstrating that there is no

11   genuine issue of material fact with respect to the adequacy of the medical care defendants

12   provided to him, on plaintiff's motion for summary judgment, the court is required to believe

13   defendants' evidence and draw all reasonable inferences from the facts before the court in

14   defendants' favor.  Drawing all reasonable inferences in defendants' favor, the court finds that

15   they have submitted evidence sufficient to create a genuine issue of material fact with respect to

16   plaintiff's claim that they responded to his serious medical needs with deliberate indifference.

17   Most notably, as detailed above, defendants have offered as evidence lengthy declarations and

18   testimony from Dr. Hinman-Seabrooks and Dr. Barnett from which a reasonable juror could

19   conclude that plaintiff's medical conditions did not require cell housing and that a dormitory

20   setting could adequately meet his medical needs.

21          Dr. Hinman-Seabrooks received her medical degree from the University of California –

22   San Francisco School of Medicine.  She is licensed to practice in California and is Board-certified

23   in Ophthalmology.  In addition to her private practice, she provides ophthalmology consultations

24   to physicians at CMF.  She has examined and treated plaintiff and reviewed his unit health

25   records.  In her medical opinion, plaintiff has no ocular pathology that would explain his reports

26   of abnormal sensitivity to light.  Nor does he have any ocular pathology that would explain his

27   reports of migraine headaches caused by such abnormal sensitivity to light.  In Dr. Hinman-

28   Seabrooks' view, plaintiff's claim that he must be housed in a cell with tinted windows and

1    cannot be housed in a dorm because light entering his eyes from "peripheral" sources (sides, tops,

2    or bottoms of his dark glasses) causes him pain and triggers migraines is not plausible.  With the

3    amount of panretinal photocoagulation procedures plaintiff has had, Dr. Hinman-Seabrooks

4    maintains that plaintiff has reduced light perception rather than increased sensitivity to light.

5    Moreover, Dr. Hinman-Seabrooks notes that when plaintiff was assigned to a dormitory setting,

6    correctional officers allowed him to put "curtains" made from bed sheets around his bed.  This

7    draping, coupled with the dark glasses he already had, would have allowed very little light into

8    his eyes.  Dr. Hinman-Seabrooks also notes that the candela measurements of light brightness

9    from plaintiff's cell (88.862 candelas) and the candela measurements of light brightness from his

10   previous dormitory settings (90.294 candelas and 67.621 candelas, respectively) are virtually the

11   same or less in the dormitory setting.  In conclusion, Dr. Hinman-Seabrooks makes clear that in

12   her medical opinion, plaintiff did not have a medical need based on vision problems and/or ocular

13   pathology for cell housing with tinted windows rather than dormitory housing.  (See generally

14   Defs.' Ex. C., Hinman-Seabrooks Decl.)

15        Dr. Barnett received his medical degree from Harvard University Medical School.  He is

16   licensed to practice in California and since 2007 has worked for California Correctional Health

17   Care Services ("CCHCS").  Dr. Barnett is currently CCHCS' Office of Legal Affairs Chief

18   Medical Officer.  Similar to Dr. Hinman-Seabrooks, in Dr. Barnett's medical opinion, plaintiff

19   did not have visual problems and/or ocular pathology to explain his report of photophobia

20   exacerbated by panretinal photocoagulation surgical procedures.  Dr. Barnett acknowledges that

21   plaintiff had early cataracts during the periods in question, but that condition was adequately

22   managed with dark eyeglasses.  According to Dr. Barnett, plaintiff also did not have migraines

23   caused by bright light.  In his medical opinion, there is no evidence to support a determination

24   that plaintiff's alleged photophobia causes him migraines.  In any event, Dr. Barnett notes that

25   doctors treated plaintiff's subjective reports of headache with medication.  Plaintiff did not

26   require cell housing with tinted windows for any alleged migraine condition.  Finally, Dr. Barnett

27   maintains that plaintiff's Charcot foot, peripheral diabetic retinopathy, and subjective reports of

28   bowel and urinary urgency did not require cell housing or preclude him from staying in a

1    dormitory.  In conclusion, Dr. Barnett makes clear that in his medical opinion, the defendants,

2    namely Dr. Bick, appropriately chose not to follow some of plaintiff's treating physicians'

3    recommendations with respect to plaintiff's housing.  (See generally Defs.' Ex. D, Barnett Decl.)

4         In short, based on the evidence presented in connection with the pending cross-motions

5    for summary judgment, a reasonable juror could conclude that defendants were not deliberately

6    indifferent to plaintiff's serious medical needs and therefore did not violate his rights under the

7    Eighth Amendment.  Accordingly, plaintiff's motion for summary judgment on his Eighth

8    Amendment claims should be denied.

9         The court turns now to defendants' motion for summary judgment on plaintiff's Eighth

10   Amendment claims.  The court first notes that it questionable at best whether, in light of  the

11   evidence presented by defendants themselves regarding the chromos and medical treatment they

12   provided plaintiff along with evidence essentially repudiating the treatment they provided him,

13   whether defendants have met the initial burden of demonstrating that there is no genuine issue of

14   material fact with respect to the adequacy of the medical care provided to plaintiff.  Even

15   assuming defendants had satisfied their initial burden, however, on defendants' motion for

16   summary judgment the court is required to believe plaintiff's evidence and draw all reasonable

17   inferences from the facts before the court in plaintiff's favor.  Drawing all reasonable inferences

18   in plaintiff's favor, the court finds that plaintiff has clearly submitted sufficient evidence to create

19   a genuine issue of material fact with respect to his claim that defendants Bick, Andreasen,

20   Khoury, Donahue, and Thomas responded to his serious medical needs with deliberate

21   indifference.  The court also does finds, however, that plaintiff has failed to submit sufficient

22   evidence to create a genuine issue of material fact with respect to his claim that defendant

23   Moreno responded to his serious medical needs with deliberate indifference.  See Farmer, 511

24   U.S. at 834; Estelle, 429 U.S. at 106.

25        First, as to defendant Bick, it is undisputed that defendant Bick rejected or modified some

26   of plaintiff's treating physicians' medical chronos recommending cell housing for him.  As noted

27   above, on March 9, 2004, Dr. Crapotta, an ophthalmologist, recommended dark glasses and

28   window tint in plaintiff's housing, but defendant Bick only approved dark glasses and not cell

1  housing with window tint for plaintiff.  (Defs.' Ex. C., Hinman-Seabrooks Decl., HS229.)

2  Similarly, on May 16, 2005, Dr. Capozzoli, a neurologist, recommended cell housing for plaintiff,

3  but defendant Bick changed Dr. Capozzoli's "recommendation" to a "request" for cell housing,

4  which authorized custody staff to assign plaintiff to a cell or dormitory based on custody and

5  institutional safety requirements.  (Defs.' Ex. D, Barnett Decl., BB545.)

6       Again, as defense counsel argues, a mere difference of opinion between doctors does not

7  give rise to liability on a § 1983 claim.  See Snow, 681 F.3d 987.  Ultimately, defense counsel

8  may prove this case is simply about that.  On the other hand, plaintiff may well be able to

9  establish that this is instead a case in which defendant Bick deliberately ignored plaintiff's

10  treating physicians' medical chronos recommending cell housing for him.  It is well established

11  that deliberate indifference may be shown when prison officials ignore express orders from a

12  prisoner's treating physician.  See Estelle, 429 U.S. at 104-05 (deliberate indifference may

13  manifest "by prison doctors in their response to the prisoner's needs or by prison guards in

14  intentionally denying or delaying access to medical care or intentionally interfering with the

15  treatment once prescribed"); Snow, 681 F.3d at 988 (non-treating, non-specialist physicians may

16  have been deliberately indifferent to prisoner's needs when they repeatedly denied outside

17  specialists' recommendations for hip-replacement surgery); Jett, 439 F.3d at 1097-98 (prison

18  doctor may have been deliberately indifferent to a prisoner's medical needs when he decided not

19  to request an orthopedic consultation as the prisoner's emergency room doctor had previously

20  ordered); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (a prisoner may establish

21  deliberate indifference by showing that a prison official intentionally interfered with his medical

22  treatment); Wakefield v. Thompson, 177 F.3d 1160, 1165 & n.6 (9th Cir. 1999) ("a prison official

23  acts with deliberate indifference when he ignores the instructions of the prisoner's treating

24  physician or surgeon.").

25       Thus, based on the record in this case, the court finds that a reasonable jury could

26  conclude that defendant Bick was deliberately indifferent to plaintiff's serious medical needs and

27  therefore, defendant Bick is not entitled to summary judgment with respect to plaintiff's Eighth

28  Amendment claim.

1    As to defendants Andreasen, Khoury, and Donahue, it is undisputed that these defendants

2    (as well as defendant Bick) were involved in denying plaintiff's administrative grievances

3    regarding his requests for medical chronos for cell housing.  (Sec. Am. Compl. Attachs. 2E, 2H.)

4    Defense counsel is correct that inmates have no separate constitutional right to a prison grievance

5    or appeal system.  See Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003); Mann v. Adams,

6    855 F.2d 639, 640 (9th Cir. 1988).  However, defense counsel goes too far in arguing that

7    defendants Andreasen, Khoury, and Donahue could not provide plaintiff any remedy through the

8    administrative grievance process because defendant Bick did nothing wrong in denying plaintiff's

9    requests for medical chronos for cell housing.  For the reasons discussed above, whether

10   defendant Bick's decision to deny plaintiff's requests for medical chronos for cell housing was

11   medically acceptable remains a question of fact for the jury.  If plaintiff can establish that

12   defendant Bick was deliberately indifferent to his serious medical needs in denying those

13   requests, he may well also be able to establish defendants Andreasen, Khoury, and Donahue are

14   similarly liable.  See, e.g., Uriarte v. Schwarzenegger, No. 06cv1558-MMA (WMC), 2011 WL

15   4945232 at *6 (S.D. Cal. Oct. 18, 2011) ("[A] plaintiff may establish liability on the part of

16   defendants involved in the administrative grievance process under the Eighth Amendment by

17   alleging that his appeal put the defendants on notice that he had a serious medical need that was

18   not being met, and that their denial therefore constituted deliberate indifference."); Kunkel v. Dill,

19   No. 1:09-cv-00686-LJO-SKO PC, 2010 WL 3718942 at *1 (E.D. Cal. Sept. 15, 2010) ("Plaintiff,

20   here, has alleged sufficient facts that plausibly support the conclusion that Defendant Pfeiffer,

21   despite having no medical training, was aware that the denial of Plaintiff's administrative appeal

22   requesting medical treatment exposed Plaintiff to an excessive risk of harm."); Herrera v. Hall,

23   No. 1:08-cv-01882-LJO-SKO PC, 2010 WL 2791586 at *4 (E.D. Cal. July 14, 2010) ("[I]f there

24   is an ongoing constitutional violation and the appeals coordinator had the authority and

25   opportunity to prevent the ongoing violation, a plaintiff may be able to establish liability by

26   alleging that the appeals coordinator knew about an impending violation and failed to prevent

27   it.").

28   /////

1    Based on the evidence submitted on the pending motion, the undersigned finds that a

2    reasonable jury could conclude that defendants Andreasen, Khoury, and Donahue were

3    deliberately indifferent to plaintiff's serious medical needs and therefore, these defendants are not

4    entitled to summary judgment in their favor with respect to plaintiff's Eighth Amendment claims.

5    As to defendant Thomas, it is undisputed that on December 13, 2005, plaintiff moved

6    from Wing P-1 to Wing H-3.  (Defs.' Ex. E, Weaver Declaration.)  According to plaintiff's

7    version of events, on that date, defendant Thomas called him and fellow inmate Espinoza into the

8    P-1 office to discuss the fact that the P-1 Dorm was closing.  During the discussion, plaintiff tried

9    to show defendant Thomas his medical chrono authored by Dr. Capozzoli recommending that

10   plaintiff receive cell housing rather than dormitory housing because a dormitory is "less

11   conducive to accommodating his . . . medical needs."  However, defendant Thomas replied, "I

12   don't care what that says."  (Sec. Am. Compl., Pl.'s Decl. at 5.)

13   It is well established that deliberate indifference may be shown where a defendant

14   purposefully ignores or fails to respond to a possible serious medical need.  See McGuckin, 974

15   F.2d at 1060.  Viewing the facts in light most favorable to plaintiff, the court simply cannot

16   determine to what extent defendant Thomas knew of and disregarded plaintiff's serious medical

17   needs.  Thus, based on the evidence presented on summary judgment in this case, the court finds

18   that a reasonable jury could conclude that defendant Thomas was deliberately indifferent to

19   plaintiff's serious medical need and therefore, defendant Thomas is not entitled to summary

20   judgment on plaintiff's Eighth Amendment claim.

21   Finally, the court will address the pending motion for summary judgment as to defendant

22   Moreno.  As noted above, the court finds that plaintiff has not come forward with sufficient

23   evidence on summary judgment to raise a genuine issue of material fact with respect to his claim

24   that defendant Moreno violated plaintiff's rights under the Eighth Amendment.  It is undisputed

25   that on January 27, 2005, plaintiff moved from Wing J-3 to Wing P-1, which had been converted

26   to a dormitory.  According to plaintiff, defendant Moreno was directly involved in causing

27   plaintiff to suffer because on that same day, defendant Moreno authored a memorandum that

28   ordered staff to leave the lights on from 8:00 a.m. to 10:00 p.m. to ensure adequate safety for staff

73

1    and inmates and institutional security.  (Sec. Am. Compl. at 7-8 & Ex. 30.)  However, at the time

2    defendant Moreno issued his memorandum, he did not know that plaintiff was assigned to a

3    dorm, and plaintiff admittedly had not had any personal conversations with defendant Moreno

4    regarding his alleged inability to tolerate light.  (Defs.' Ex. L & Pl.'s Dep. RT 120:22-25.)  Of

5    course, "prison officials who lacked knowledge of a risk cannot be said to have inflicted

6    punishment."  Farmer, 511 U.S. at 844.

7        Moreover, even assuming for the sake of argument that defendant Moreno was aware of

8    plaintiff's presence in the dorm and knew about plaintiff's serious medical conditions as plaintiff

9    contends, under the terms of plaintiff's medical chrono at the time, defendant Moreno was not

10   required to provide plaintiff with cell housing or window tint.  Nor did the  chrono issued to

11   plaintiff suggest that he could not otherwise be subjected to general lighting in his housing for

12   medical reasons.  Dr. Crapotta had authored the medical chrono at issue.  Although the medical

13   chrono originally stated that plaintiff should "have window tint as consistent with California

14   Medical Facility regulations," defendant Bick had lined through that portion of the chrono

15   regarding window tint and wrote "only CMF approved dark glasses."  (Defs. Ex. C. Hinman-

16   Seabrooks Decl., Attach. 1 HS229.)

17       Plaintiff has come forward with no evidence on summary judgment to show that

18   defendant Moreno had the authority to ignore defendant Bick's modifications to the chrono.  In

19   this regard, insofar as defendant Moreno was aware of plaintiff's presence in the dorm and

20   plaintiff's medical chrono, his decision to issue the memorandum regarding lighting and

21   implicitly abide by defendant Bick's modifications of the chrono and not the original

22   recommendation by Dr. Crapotta,  at most constituted neglect or indifference and not deliberate

23   indifference.  See McGuckin, 974 F.2d at 1060 ("A finding that the defendant's neglect was an

24   'isolated occurrence' or an 'isolated exception,' . . . militates against a finding of deliberate

25   indifference"); Wood, 900 F.2d at 1334 ("In determining deliberate indifference, we scrutinize

26   the particular facts and look for substantial indifference in the individual case, indicating more

27   than mere negligence or isolated occurrences of neglect.").  Based on the evidence submitted at

28   the summary judgment stage of these proceedings, the court finds that a reasonable jury could not

1    conclude that defendant Moreno was deliberately indifferent to plaintiff's serious medical needs

2    and therefore concludes that defendant Moreno is entitled to summary judgment in his favor as to

3    plaintiff's Eighth Amendment claim.

4        In short, based on the evidence presented in connection with the pending cross-motions

5    for summary judgment, the court finds that a reasonable juror could conclude that defendants

6    Bick, Andreasen, Khoury, Donahue, and Thomas (but not defendant Moreno) were deliberately

7    indifferent to plaintiff's serious medical needs and therefore did violate his rights under the

8    Eighth Amendment.  Accordingly, defendants' motion for summary judgment on plaintiff's

9    Eighth Amendment claims should be denied as to Bick, Thomas, Andreasen, Khoury, and

10   Donahue and granted as to defendant Moreno.

11   II.  Plaintiff's ADA Claims

12       Next, the court will address the parties' cross- motions for summary judgment with

13   respect to plaintiff's ADA claims.  As an initial matter, the Ninth Circuit has held that the

14   "deliberate indifference" standard applies to claims for intentional discrimination under Title II of

15   the ADA.  See Duvall v. County of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001).  In this regard,

16   the Ninth Circuit has stated that "[d]eliberate indifference requires both knowledge that a harm to

17   a federally protected right is substantially likely, and a failure to act upon that likelihood."  Id. at

18   1139.

19       As to plaintiff's motion for summary judgment on his ADA claims, for the same reasons

20   discussed above with respect to his Eighth Amendment claims, the court finds that plaintiff has

21   failed to meet his initial burden of demonstrating that the defendants intentionally discriminated

22   against him because of a disability or disabilities.  Moreover, even if plaintiff had met his initial

23   burden, the court finds that the defendants have come forward with sufficient evidence on

24   summary judgment to create a genuine issue of material fact with respect to plaintiff's claim that

25   they intentionally discriminated against him based on a disability or disabilities.  In addition to

26   the evidence described above, defendants have submitted evidence on summary judgment

27   demonstrating that, in late December 2004 and into 2005, CMF had to appropriately house an

28   influx of inmates serving life prison terms with close-custody designations in cells during

75

1    ongoing remedial actions undertaken in <u>Coleman v. Schwarzenegger</u>, et al, No. 2:90-cv-0520

2    LKK JFM P. (Defs.' Ex. K, Thomas Interrog. Resp. No. 1.)  Close custody inmates are those

3    whose case factors indicate a need for close supervision, and state regulations require that close

4    custody inmates be housed in cells to ensure institutional security and public safety.  (<u>Id.</u>)

5    According to defendants' evidence, because plaintiff was a Medium A custody inmate, and not

6    because of a disability, he was among a group of Medium A custody inmates who were moved

7    from cells to dorms to make room for close custody inmates and Medium A custody inmates

8    designated for single cells.  Indeed, even plaintiff himself acknowledges that defendants moved

9    him from cell housing to dorm housing at least in part based on his Medium A custody level.

10   (Pl.'s Mot. for Summ. J., SUDF 21.)  Accordingly, plaintiff's motion for summary judgment with

11   respect to his ADA claims should be denied.

12           Turning now to defendants' motion for summary judgment on plaintiff's ADA claims,

13   defense counsel argues that plaintiff's request for injunctive relief is now moot because plaintiff

14   has been housed in a cell with tinted windows for the last seven years.  The defendants have not,

15   however, come forward with any evidence establishing why plaintiff has been so housed, whether

16   that housing assignment was made based upon the preliminary injunction previously issued in

17   plaintiff's earlier action in this court or whether that housing assignment will or is likely to

18   continue unchanged.  Defendants have therefore not satisfied their burden on summary judgment

19   in this regard.

20           Defense counsel also argues that defendants are entitled to summary judgment on

21   plaintiff's claim for damages under the ADA because plaintiff has not shown that the defendants

22   intentionally discriminated against him.  However, as discussed above, this court finds that

23   plaintiff has submitted sufficient evidence on summary judgment to create a genuine issue of

24   material fact with respect to his claim that defendants Bick, Andreasen, Khoury, Donahue, and

25   Thomas responded to his serious medical needs with deliberate indifference and/or intentionally

26   discriminated against him.  Under plaintiff's version of events, supported by some evidence,

27   plaintiff informed defendants Bick, Andreasen, Khoury, Donahue, and Thomas of his medical

28   chronos recommending cell housing for him, but they deliberately made the decision to

1   "accommodate" his disability(s) by housing him in a dormitory setting with dark glasses and

2   draping.  Viewing the facts in the light most favorable to plaintiff, a reasonable jury could

3   conclude that defendants Bick, Andreasen, Khoury, Donahue, and Thomas thereby intentionally

4   discriminated against plaintiff.  Accordingly, defendants' motion for summary judgment on

5   plaintiff's claim for damages under the ADA should be denied.

6   III.  Plaintiff's Request for Injunctive Relief Pursuant to 42 U.S.C. § 1983

7        The court now turns to defense counsel's contention that most of plaintiff's requests for

8   injunctive relief pursuant to 42 U.S.C. § 1983 should be denied.  By way of background, in the

9   prayer for relief section of plaintiff's second amended complaint, plaintiff asks the court to issue a

10  permanent injunction that requires defendants to ensure that:  (1) he remains in cell housing with

11  tinted windows for the duration of his incarceration; (2) he receives a diabetic diet; (3) he has a

12  personal glucometer in his cell; (4) he is allowed cotton blankets in his cell; (5) he has egg-crate

13  mattress pads as needed for use in his cell; (6) he receives daily showers while incarcerated; (7)

14  he receives his meals in-cell while incarcerated; and (8) he is not placed in areas that are brightly

15  lit beyond what he can tolerate in his cell during cell or unit searches.  (Sec. Am. Compl. at 20.)

16       Defense counsel argues that plaintiff's enumerated requests (2) through (8) lack merit.  In

17  opposition to their motion, plaintiff reiterates by reference to his second amended complaint that

18  prison officials and not his attending physicians have made a number of medical decisions with

19  respect to these items and services that directly affect him.  In this regard, he alleges that in 1998,

20  departmental headquarters made a decision to replace diabetic diets with nourishment bags.  In

21  addition, he alleges that he received approval for a personal glucometer in his cell to test his

22  blood sugar levels, but departmental headquarters denied it "as a threat to nurses' job security."

23  Plaintiff also alleges that he has a wool blanket allergy and has had prescriptions for egg-crate

24  mattress pads, daily showers, and in-cell feeding, but prison officials have determined that

25  blankets, mattress pads, showers, and the "meals on wheels" program are non-medical and are

26  part of custody staff programs.  (Pl.'s Sec. Am. Compl. at 9-10.)

27       Insofar as plaintiff is seeking relief under the Eighth Amendment for a diabetic diet,

28  personal glucometer, cotton blankets, egg-crate mattress pads, daily showers, in-cell meal service,

77

1    and prohibition on his placement in brightly lit areas during cell or unit searches, such relief

2    should be denied.  Specifically, to the extent that plaintiff has even alleged that defendants had

3    any involvement with these decisions, plaintiff has not adequately alleged, let alone presented any

4    evidence establishing, that the decisions in question rise to the level of an Eighth Amendment

5    violation.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (only those deprivations denying

6    "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an

7    Eighth Amendment violation.").

8         As to plaintiff's request for a diabetic diet, plaintiff has not alleged that any specific

9    defendants were responsible for the decision replacing diabetic diets with nourishment bags.  Nor

10   has plaintiff presented any evidence demonstrating that the meals he receives are inadequate for

11   purposes of his medical needs.  As to his personal glucometer, again, plaintiff has not alleged that

12   any specific defendants were responsible for the decision denying him a personal glucometer.  In

13   addition, although there is no dispute that plaintiff needs periodic blood glucose checks, there is

14   also no dispute that medical staff monitors his blood glucose at the B-1 Clinic.  Plaintiff has not

15   come forward with any evidence showing how staff monitoring at the B-1 Clinic is inadequate for

16   purposes of his medical needs.  As to the cotton blankets, egg-crate mattress pads, daily showers,

17   and in-cell feeding, as defense counsel observes, plaintiff does not complain that prison officials

18   have denied him these items and services.  Rather, plaintiff complains about the manner in which

19   he receives those items, that is, through custody staff approval and not by medical chrono.

20   However, once more, plaintiff has not demonstrated that the process of obtaining these items and

21   services is inadequate for purposes of his medical needs.  Finally, as to plaintiff's request to not

22   be placed in brightly lit areas during cell or unit searches, there is no dispute that plaintiff has a

23   medical chrono that states he should not be placed in situations where he will be unnecessarily

24   subjected to bright lights for prolonged periods of time.  Plaintiff has not shown that his existing

25   chrono is inadequate for purposes of his medical needs.

26        In short, based on the evidence submitted on summary judgment, the undersigned finds

27   that plaintiff's enumerated requests (2) through (8) for injunctive relief are unsupported and

28   should be denied.  Accordingly, defendants' motion for summary judgment on these aspects of

1    plaintiff's request for injunctive relief should be granted.

2    IV.  Qualified Immunity

3         Finally, the court will address defense counsel's contention that the defendants are entitled

4    to qualified immunity on plaintiff's Eighth Amendment claims.  Again, viewing the facts of this

5    case in the light most favorable to the plaintiff, defendants Bick, Andreasen, Khoury, Donahue,

6    and Thomas violated plaintiff's constitutional rights.  As discussed above, deliberate indifference

7    may be shown when prison officials ignore express orders from treating physicians and when

8    prison officials purposefully ignore or fail to respond to a possible medical need.  See Estelle, 429

9    U.S. at 104-05; McGuckin, 974 F.2d at 1060.

10        Moreover, by December 17, 2004, the date plaintiff transferred from cell housing to

11   dormitory housing, "the general law regarding the medical treatment of prisoners was clearly

12   established," and "it was also clearly established that [prison staff] could not intentionally deny or

13   delay access to medical care."  Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002).  In this

14   regard, defendants should have known that by failing to provide plaintiff with cell housing with

15   tinted windows as prescribed by his treating physicians violated his rights under the Eighth

16   Amendment.  Accordingly, defendants' motion for summary judgment based on the affirmative

17   defense of qualified immunity should be denied.

18                                    **OTHER MATTERS**

19        Defense counsel has submitted various objections to plaintiff's evidence.  Insofar as

20   defendant's objections are relevant to the court's disposition of the pending cross-motions as set

21   forth herein, they are overruled.  It would be an abuse of discretion to refuse to consider evidence

22   offered by a pro se plaintiff at the summary judgment stage.  See, e.g., Jones v. Blanas, 393 F.3d

23   918, 935 (9th Cir. 2004) (reversing and remanding with instructions to consider evidence offered

24   by the pro se plaintiff in his objections to the findings and recommendations).

25                                       **CONCLUSION**

26        For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that:

27        1.  Plaintiff's renewed motion for summary judgment (Doc. No. 76) be denied;

28   /////

1      2.  Defendants' motion for summary judgment (Doc. No. 68) be granted in part and

2  denied in part as follows:

3          a.  Defendants' motion for summary judgment on plaintiff's Eighth Amendment

4  claims be granted as to defendant Moreno but denied as to defendants Bick, Andreasen, Khoury,

5  Donahue, and Thomas;

6          b.  Defendants' motion for summary judgment on plaintiff's request for injunctive

7  relief under ADA be denied;

8          c.  Defendants' motion for summary judgment on plaintiff's claim for damages

9  under ADA be denied;

10          d.  Defendants' motion for summary judgment on plaintiff's request for injunctive

11  relief pursuant to 42 U.S.C. § 1983 for a diabetic diet, personal glucometer, cotton blankets, egg-

12  crate mattress pads, daily showers, in-cell meals, and prohibition on his temporary placement in

13  brightly lit areas during cell or unit searches be granted; and

14          e.  Defendants' motion for summary judgment based on the affirmative defense of

15  qualified immunity be denied.

16          These findings and recommendations are submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

18  days after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

21  shall be served and filed within seven days after service of the objections.  The parties are advised

22  that failure to file objections within the specified time may waive the right to appeal the District

23  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

24  Dated:  October 10, 2013

25

26  DAD:9
    stri0986.57

27                                    DALE A. DROZD
                                      UNITED STATES MAGISTRATE JUDGE

28